BROWNE-VINTNERS CO., Inc., G. H. Mumm & Co., Société Vinicole de Champagne Successeurs, G. H. Mumm & Co. (Société Vinicole de Champagne Successeurs) of New York, Inc., Plaintiffs,

v.

NATIONAL DISTILLERS AND CHEMICAL CORPORATION, Defendant.

United States District Court
S. D. New York.
May 15, 1957.

C. P. Goepel, New York City, for plaintiffs.

Breed, Abbott & Morgan, New York City, for defendant, Gerald J. Craugh, New York City, and Morris, Pearce, Gardner & Pratt, David A. Fegan, Washingon, D. C., of counsel.

McGOHEY, District Judge.

This is an action for injunctive relief and damages for alleged infringement of

the three registered trade-marks applied to champagne, "G. H. Mumm & Co.," "Mumm" and "Mumm-Reims"; and for unfair competition. Jurisdiction rests on the trade-mark laws of the United States and diverse citizenship of the parties.

The defendant, by selling Rhine wine under the name "G. H. v. Mumm," has competed unfairly with the plaintiffs and infringed their trade-mark "G. H. Mumm & Co." A decree of injunction will be entered. As the plaintiffs showed no pecuniary loss, an accounting will not be ordered.

The plaintiffs are G. H. Mumm & Co. Société Vinicole de Champagne, Successeurs, a French corporation (hereafter called the French Société), which produces champagne at Rheims, France; G. H. Mumm & Co. Société Vinicole de Champagne, Successeurs of New York, Inc., a New York corporation (hereafter called the New York Société), which is a wholly owned subsidiary of the French Société and the present registered owner of the trade-marks; and Browne-Vintners Co., Inc., a Delaware corporation, which imports champagne produced by the French Société into the United States and sells it here under the trade-marks, pursuant to exclusive licenses from the French and New York Sociétés.

The defendant is National Distillers Products Corporation (hereafter called National), a Virginia corporation, which was substituted for the original defendant Bellows & Co., Inc., a New York corporation, after the latter was merged with National.

In 1934 Bellows & Co. commenced to distribute bottled Rhine wine in the United States as the agent of the supplier which was also the producer of the wine. At that time the main label on the bottles indicated "Hermann v. Mumm'sche Kellerei" as the producer. In 1937, this was changed to "Johannisberger aus der G. H. v. Mumm'sche Kellerei" (Johannisberg wine from the cellar of G. H. v. Mumm). The main label also contains the ancient coat of arms of the Mumm family. On another label affixed to the neck of the bottles appear the words "G. H. v. Mumm'sche Gutsverwaltung" (Administration of the Estate of G. H. v. Mumm). The latter is located at Johannisberg, Germany. It is the present producer of the Rhine wine and the supplier of National.

"Godefroy H. v. Mumm & Co., Kellereinen of Eltville-am-Rhein, Germany" is the producer of various wines other than Rhine wine, including a sparkling wine similar to champagne. It is a limited partnership with share owners, of whom the largest and the legally and financially responsible partner is Godefroy Hermann von Mumm who for convenience will hereafter be called "Godefroy." He is also the legal and financially responsible head of the "Gutsverwaltung." The estate is that of Hermann von Mumm, who was his father.

The complaint alleged that since 1853 the French Société and its predecessors have sold champagne in the United States under the trade-marks "Mumm," "G. H. Mumm & Co." and "Mumm-Reims"; that the American Société now owns those trade-marks and their United States registrations; that Browne-Vintners is the sole agent in the United States for the sale and distribution of the French Société's product under those trade-marks; that the defendant National imports Rhine wine from G. H. v. Mumm'sche Kellerei and sells it in interstate commerce under the latter name, thus tending to and in fact causing confusion and deception as to the source of the Rhine wine; all of which constitutes infringement and unfair competition, done with knowledge and for the purpose of trading on the good will attached to the French Société's trade-marks. It asks that National be enjoined "from using upon or in connection with the sale of *wines or any other beverages* the words G. H. v. Mumm or the word Mumm or any other colorable imitation of any of the same." (Emphasis supplied.)

National's answer denies these allegations except the allegation that it im-

ports Rhine wine from G. H. v. Mumm'sche Kellerei and sells it here in interstate commerce, and pleads as defenses that the complaint failed to state a relievable claim and that the plaintiff has been guilty of laches.

More than a year after the answer was filed National moved for leave to amend and interpose a counterclaim in which it asserted, *"if the court should find"* that "the marks of the defendant's supplier and the plaintiff's marks are confusingly similar and likely to cause confusion * * * *then* [the defendant's] supplier and not any of the plaintiffs has the exclusive right to the use of the mark or word 'Mumm,' or any combination thereof with other words, in association with the sale and distribution of *potable beverages* * * *"; and prayed for a decree that the "defendant's supplier has the *sole and exclusive right* to the use of the trade-marks 'Mumm,' 'Mumm-Reims' and 'G. H. Mumm & Co.' and any like words or combinations thereof" and that the "plaintiffs and those controlled by them" be enjoined from using those words or any like words or combinations thereof *"upon or in connection with the sale of wines, champagnes or other beverages."* (Emphases supplied.)

Judge Weinfeld denied that motion but gave National's supplier leave to intervene in this action, D.C., 15 F.R.D. 205. This, the latter did not do, although it is under agreement to hold National harmless.

In its brief filed after trial National does not, as it did in its proposed counterclaim, assert its claims with respect to ownership of the trade-marks and the validity of the United States registrations, in the subjunctive. It now contends unconditionally that the evidence in this case requires a decree that only National's supplier, of which Godefroy is the head, has "the right to the exclusive use of the marks 'Mumm' on vinous products"; that the plaintiffs have no right whatsoever in the trade-marks; that the registrations thereof in the Patent Office should be ordered cancelled;

and that the plaintiffs should be permanently enjoined from "any and all use of [the name 'Mumm'] on and in association with vinous products" except that the French Société "might be permitted to continue to use the name 'G. H. Mumm & Co. Société Vinicole de Champagne, Successeurs' on and in association with French champagne, provided that all the words of such name are of the same size, color, style and prominence, and further provided its labels contain an appropriate notation to the effect that it is not associated with the defendant's supplier."

This is but the latest in a long series of law suits over these trade-marks. It will be helpful in understanding the issues presented here, to summarize the historical context in'which they arise.

For almost a century and a half the Johannisberg vineyards have been owned and operated by successive generations of the Mumm family whose ancestor Peter Arnold Mumm founded the family wine business at Frankfort, Germany, fifty years before the Johannisberg properties were acquired in 1811. The Rhine and other wines produced on the family vineyards in Germany have been sold under some form of the name "Mumm" for very close to two centuries.

In 1827 members of the family then engaged in the wine business in Germany under the name "P. A. Mumm & Co., Frankfort, Cologne, Johannisberg," established a champagne business at Rheims, France. This, also, was carried on by successive generations of the family until 1914, usually under management by the same persons who managed the wine business in Germany. At first it went under the name "P. A. Mumm-Giesler & Co.-Rheims." In 1837 that firm was dissolved and until 1853 the champagne business was carried on under the German wine company's name to which was added the word "Rheims," namely, "P. A. Mumm & Co., Frankfort, Cologne, Johannisberg, Rheims." In 1914 it was being conducted under the name "G. H. Mumm & Co.-Rheims,"

as it had been since 1853 when Georges Hermann Mumm, the grandson of Peter Arnold and the great-grandfather of Godefroy, having succeeded to control of the family affairs, decided to carry on the champagne business under his name. Champagne sold under the name "G. H. Mumm" had enjoyed renown in the United States and throughout the world for many years prior to 1914.

After the outbreak of World War I, France seized the champagne company and all its assets including trade-marks and good will as alien enemy property; and in 1920 sold them to the French Société whose name was then "Société Vinicole de Champagne." The change to its present name "G. H. Mumm & Co. Société Vinicole de Champagne, Successeurs" was made in 1946. At the time of the seizure of G. H. Mumm & Co.-Rheims, Godefroy's father, Hermann von Mumm, was its head. It then owned the trade-marks: "G. H. Mumm & Co.," "Mumm" and "Mumm-Reims" which in 1906 it had registered in the United States. By the terms of the Versailles Treaty, Germany undertook to indemnify its nationals for property seized by France and thereafter, under laws enacted pursuant to the Treaty, paid the Mumm family more than $1.7 million-gold. Since 1920 the French Société has produced champagne and sold it throughout the world including, since 1933 at least, the United States, under the names "G. H. Mumm & Co.," "Mumm" and "Mumm-Reims." In 1923, the French Société registered the three trade-marks in its own name as the successor of G. H. Mumm & Co.-Rheims. The registrations were subsequently renewed and in 1948 they were republished under the Lanham Act. The French Société has built up in the United States a large and profitable trade in its champagne sold under the trade-marks. Its champagne enjoys wide renown.

The Mumm family has refused and seemingly still refuses to abide the results of the French action of 1914. Since the end of World War I members of the family have repeatedly attempted by various means to establish a champagne business under the name "Mumm" in some form. This has resulted in a series of litigations both abroad and here. In all of these, Godefroy's father, Hermann von Mumm, who was then the head of the family, and the others who were parties, sought to nullify France's seizure and sale of G. H. Mumm & Co.-Rheims to the French Société, or at least to circumscribe the effects of these actions so as to enable members of the family to engage in the champagne business in France and elsewhere under some form of the name "Mumm" and to compete for the french Société's trade in champagne sold under the trade-marks. These efforts uniformly failed. One was a suit in this court decided in 1935.[1] Judge Woolsey there held that the French Société was the owner of the three trade-marks here in issue and that the United States registrations thereof in its name were valid. He restrained Walther Mumm, Mumm Champagne and Importation Co., Inc. and its other officers, agents and servants from using the name "Mumm" in advertising or selling champagne not produced by the French Société. Godefroy, a nephew of Walther, was a vice president of Mumm Champagne and Importation Co., Inc. Judge Woolsey reached the following, among other conclusions.[2]

"1. * * * the sale by the French liquidator of the properties and business of G. H. Mumm & Co., which was a société en nom collectif formed under French law, with its domicile at Reims, France, conveyed to [the French Société] the good will of G. H. Mumm & Co. and the ownership of the trade-name and the trade-marks which were symbolic of

1. Société Vinicole de Champagne v. Mumm Champagne & Importation Co., Inc., D. C., 13 F.Supp. 575. The extensive findings in the opinion describe various proceedings before the French courts and the Mixed Franco-German Tribunal.

2. 13 F.Supp. at pages 593–594.

that good will wherever they had been or might be used. * * *

"3. G. H. Mumm & Co. was not only domiciled at Reims, France, but it manufactured champagne only at that place, and from 1854 at least until the European war the firm had a large and most successful trade in the United States * * *.

"The word 'Mumm' has by this long identification with an excellent product acquired in the champagne trade so settled a secondary meaning as representing a brand of champagne that any name which [Mumm Champagne & Importation Co., Inc.] as the agent of Hermann Mumm [3] and his companies, may be allowed to use, will unfairly impinge on the [French Société's] trade if the name 'Mumm' is allowed to be featured in any way in connection with the word 'Champagne.'

"4. The trade-marks used by G. H. Mumm & Co. for their champagne were used by them for many years, and were registered by them as owners, not only in France, but also in the United States Patent Office, under the terms of section 2 of our Trade Mark Act, title 15, United States Code, § 82 (15 U.S.C.A. § 82).

"5. So far as G. H. Mumm & Co.'s trade-marks in this country are concerned, the registration by the [French Société] of those trade-marks as owner has been fully regularized and has remained unchallenged here, in some cases for upwards of twelve years, and in all cases for upwards of seven years.

"7. The Mumm family, which had built up the business of G. H. Mumm & Co., and which in the present generation is represented by Hermann [Godefroy's father] and Walther Mumm [Godefroy's uncle], * * * lost the business by the fortunes of war, and now are unwilling to abide by that arbitrament,

although they have been indemnified under the provisions of the Treaty of Versailles and under German laws made in pursuance thereof in an amount which, in so far as it may have any relevancy here, I must assume to have been what the German government considered a just compensation for their loss.

"8. From the time peace was restored between France and Germany by the Treaty of Versailles, Hermann and Walther Mumm have consistently maintained a somewhat surreptitious unfair competition with the plaintiff in France and elsewhere, and that [sic] the instances of unfair competition which have now emerged into the open on the American scene, owing to the repeal of the Eighteenth Amendment, are merely new evidences of a policy which they have been continuously following for years.

"9. When in pursuance of this policy and, in spite, of the repeated decisions of the Mixed Franco-German Tribunal above cited, Walther Mumm incorporated the [Mumm Champagne and Importation Co., Inc.] in 1933, he did so with the intention of trespassing as much as he could by this artful means on the good will of G. H. Mumm & Co. which the [French Société had acquired by purchase from the French liquidator."

Judge Woolsey's final decree was entered May 25, 1937. The Mumms did not appeal. Neither, however, did they cease their efforts to establish a champagne business under the name "Mumm" in competition with the French Société in the United States. Judge Woolsey had decreed that, in the champagne business, Walther could not use "any name other than Mumm von Schwarzenstein" which the judge held to be his true name. In June, 1943, seven and a half years after the opinion was filed and six years after entry of the final

3. This was the father of Godefroy.

decree, Walther moved to lift this restriction. The grounds of the motion were these; in April, 1938, he had become a citizen of the United States under the name "Walther Mumm"; he desired to engage in the manufacture of American domestic sparkling wine and to market it under the name "W. Mumm's Black Top Very Dry Special American Champagne"; the decree restrained him from doing business in champagne under the only name he could lawfully use, and ought to be amended to permit him to do so. Judge Woolsey denied the motion and this was affirmed.[4]

The decree National seeks here would: (a) take from the French Société, without compensation, valuable assets it purchased from France and profitably exploited with consequent enhancement in value since 1920 and successfully defended in repeated litigations with the Mumms not only in Europe but in this court; (b) turn back to the Mumms assets for which they were long since compensated; (c) make a free gift to the Mumms of the good will which the French Société has built up in the champagne business in the United States at least since the repeal of prohibition in 1933; (d) permit Godefroy, contrary to Judge Woolsey's decree, to use the name "G. H. v. Mumm" in advertising and selling champagne not produced by the French Société. These results would, in effect, completely subvert the decrees of all the courts, including this one, which, in the prior litigations between Godefroy's father and other members of the Mumm family and the French Société, held the latter entitled to the exclusive right to use the trade-marks on champagne.

■ National is the sole defendant here and so the first question is whether it has standing to assert such claims, and to demand such relief; and whether in the absence of its supplier as a party here, such a decree could stand. National, it is true, besides defending against the claims for damages, has an interest to protect its monopoly of the sale in the United States of Rhine wine under the name "Mumm." But it has no present interest in the sale of champagne under that name. Accordingly protection of National's interests does not require the extraordinary relief it demands. Still less does it require that the court reach out to grant such relief to those who have rejected its invitation to come in and assert their claims. The real and permanent beneficiaries of the requested decree would be, not National whose agency even for Rhine wine may be terminated, but the Mumm family in general and Godefroy in particular who, as already noted, manufactures a sparkling wine similar to champagne. He, however, though actually present at the trial and specifically authorized by Judge Weinfeld to do so, declined to intervene and assert his and his family's claims. He was neither named nor served as a party nor did he appear as such, either in person or by attorney. He was, however, National's principal witness. He testified at great length from ancient original family records which he brought over from the family archives in Germany, the genuineness of which the plaintiffs conceded. His testimony covered the period from about 1760 to the present and included not only the family's conduct of the wine business in Germany but also of the champagne business at Rheims, France. As to the period from at least 1928 to the present, his testimony was based on personal knowledge. As noted above, Judge Woolsey enjoined not only the Mumm Champagne and Importation Co., Inc. but also its "other officers, agents and servants." Godefroy was one of these, to wit, a vice president. He now says he was merely a "nominal" officer. I do not accept this self-serving disclaimer. I think the inevitable inference from Godefroy's testimony is that his position in the corporation was substantial. Judge Woolsey, it is true, held that the corporation was the "alter ego" of Godefroy's uncle, Walther Mumm,.

4. 2 Cir., 143 F.2d 240.

who the judge found was "the sole owner of all the stock of the defendant corporation" and its "active operating head." [5] He also held, however, that the corporation was "the agent of Hermann Mumm and his companies * * *." [6] In 1935 when Judge Woolsey filed his opinion Godefroy, in accordance with the family's ancient tradition whereby the business passed from father to eldest son, was being trained to become the head of the business on his father's death. According to Godefroy's testimony, he "started in 1928 with [his] father" who taught him "the Mumm principles of producing wine and also of selling it"; and "in 1937 [his] father died and [he] succeeded to the business and the management of the business." Judge Woolsey's decree was entered in the latter year.

If the defendant's supplier, of which Godefroy is the head, had intervened here and asserted the exclusive right to use these trade-marks "on all vinous products" two questions would have arisen: (a) whether Godefroy as an officer of the defendant in the earlier suit was not estopped to challenge Judge Woolsey's findings and conclusions respecting the ownership of and the exclusive right to use the trade-marks on champagne and the ownership and vaidity of the United States registrations, and (b) whether he could now be heard to demand a decree permitting him to do precisely what Judge Woolsey's unappealed decree restrained him from doing. Godefroy is not a party to this suit and National was not a party to the 1935 suit. Because of this and also because the former suit is said to have "involved" champagne while the instant suit "involves" Rhine wine, National contends that there is no basis here for the application of estoppel doctrines. But it is in no sense correct to imply as National does that champagne is not "involved" in this case. National itself

has "involved" it by its contention that only Godefroy's wine company has the exclusive right to use the marks on "vinous products" which of course include champagne. Indeed it was the main objective of National's defense, which Godefroy managed and directed, to sustain that contention. Godefroy stipulated to be bound by the decree herein. The true situation here is this. Godefroy, who produces a sparkling wine similar to champagne, having declined to intervene in order, as seems obvious, to avoid the problems which that would have entailed, is nevertheless, in National's name, attempting (a) to revive and relitigate de novo the Mumm family's claims as to the ownership of and the exclusive right to use the trade-marks on champagne, all of which were rejected in favor of the French Société more than twenty years ago by Judge Woolsey from whose decree no appeal was taken; and (b) to secure a new decree which would permit him to use the name "G. H. v. Mumm" in advertising and selling champagne not produced by the French Société, which is precisely what Judge Woolsey restrained him from doing. I think it clear that National has no interest of its own, which a court will recognize, in these claims with respect to use of the trade-marks on champagne, and that the decree it prays for could not stand. [7] If National has any standing to assert those claims, that can only be as Godefroy's agent and on his authority. No such authority was shown. If, nevertheless, there is such authority National, as Godefroy's agent, is bound by whatever in the earlier suit would bind Godefroy. As to that, I think it clear that Godefroy as an officer of Mumm Champagne and Importation Co., Inc. is bound by Judge Woolsey's findings, conclusions and decree with respect to the French Société's ownership of the trade-marks as applied to champagne, the validity of its United States registrations thereof, and its ex-

**5.** 13 F.Supp. at page 595.

**6.** Conclusion "31" quoted supra, 13 F. Supp. 593, 594.

**7.** See G. H. Mumm Champagne v. Eastern Wine Corp., 2 Cir., 142 F.2d 499, at page 502.

clusive right to use the trade-marks on champagne. I hold moreover that it is now too late for Godefroy to seek to set aside Judge Woolsey's decree which forbids him to use the name "Mumm" in advertising or selling champagne not produced by the French Société.[8]

██ In 1948 the French Société assigned the trade-marks to the New York Société which then assigned them to Browne-Vintners, the exclusive distributor of the French Société's champagne. Browne-Vintners thereafter assigned them back to the New York Société in whose name they were thereupon registered. The New York Société then issued to Browne-Vintners a new exclusive license to import and sell the champagne. By the terms of the assignments the New York Société, which concededly does not itself sell or advertise the champagne, was given authority and responsibility to determine the quality of the champagne to be imported, the advertising of it by Browne-Vintners and the disposition of complaints. It was also charged with responsibility to protect the marks. It is not clear just why it was thought necessary to make all of these assignments.[9] This, however, need not be explored since all that is here material is the effect of the assignments on the validity of the marks. National contends the effect was to invalidate the trade-marks by separating them from the good will of the French Société's business. The contention is rejected. The New York Société is the wholly-owned and completely controlled subsidiary of the French Société. The same officers conduct both corporations. Indeed the former appears to be, for all practical purposes, merely an American office or department of the latter. It is, in any event, a related company under Sec. 45 of the Lanham Act.[10] And under Sec. 5 [11] of that Act either Société may register the marks and either may use them without affecting their validity or the validity of the registrations, provided the public is not deceived thereby.[12] Since 1920 the marks have never been applied to nor have they signified any champagne other than that produced by the French Société. There has not been and there is not any deception of the public. Browne-Vintners as the exclusive distributor of the champagne has a monopoly of its sale in the United States and thus a sufficient interest of its own in the marks to entitle it to register them in its name.[13] The "related" Sociétés and their exclusive distributor are united in a common enterprise to produce, import and sell the champagne; to exploit and enhance the good will of the business; and to protect the marks. The good will has not been separated from the marks, they have not been invalidated and they certainly have not been abandoned. All three plaintiffs have valid interests in the marks entitling them to maintain this action.

██ We come then to the issues of infringement and unfair competition. The trade-marks alleged to have been infringed do not consist of fabricated symbols [14] or fanciful words [15] or names

---

8. See 143 F.2d 240.

9. According to the testimony of its secretary, the New York Société was incorporated in 1948 for two reasons. The first was that, because of disputes between the French Société and its then exclusive distributor (not Browne-Vintners) it was deemed advisable to form an American Company to supervise the distribution and advertising of the champagne in the United States. Secondly, because of fear that nationalization of industry might occur in France, it was deemed prudent to place the United States business and the trade-marks in the hands of an American company.

10. 15 U.S.C.A. § 1127.

11. 15 U.S.C.A. § 1055.

12. See 4 Callman, Unfair Competition and Trade Marks (2 Ed. 1950) pp. 2119–20.

13. Scandinavia Belting Co. v. Asbestos & Rubber Works, 2 Cir., 257 F. 937. See also G. H. Mumm Champagne v. Eastern Wine Corp., 2 Cir., 142 F.2d 499, at page 502.

14. Miles Shoes, Inc., v. R. H. Macy & Co., Inc., 2 Cir., 199 F.2d 602; American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 208 F.2d 560.

15. Pastificio Spiga Societa Per Azioni v. De Martini Macaroni Co., 2 Cir., 200 F. 2d 325.

which have become arbitrary or fictitious.[16] In such, as is apparent, a second user can have no other interest than a purpose to trade on the owner's good will; and that interest, the law will not protect. In these marks the dominant word is a family surname "Mumm." The alleged infringing use is on Rhine wine while the plaintiffs' product is French champagne. Although both are indeed wines, each is quite distinct from the other. The latter is a sparkling wine well known and clearly designated on the labels as a product of France; the former is a still wine well known and clearly designated on the labels as a product of Germany. The retail price of the champagne is substantially greater than that of the Rhine wine. The plaintiffs concede they have lost no business to the defendant and that, so far as they know, there has been no confusion as to product among purchasers. Indeed it seems impossible that such confusion could occur. Champagne and Rhine wine are not common commodities in every day use. They are expensive luxury beverages in the selection of which, it must be assumed, purchasers exercise a considerable degree of sophisticated discrimination. In addition to the differences already noted, the bottles in which each product is traditionally sold differ so greatly in shape, color and corkage that such purchasers could not possibly mistake one product for the other.

The plaintiffs also concede that, as far as they know, there has been no confusion as to the source of the Rhine wine. However, they do not concede, and indeed it cannot be said that, there is no likelihood of some such confusion.[17] "G. H. Mumm & Co.," the French Société's trade-mark, is so nearly indentical with "G. H. v. Mumm," the name under which Godefroy sells the Rhine wine, that a prospective purchaser of the latter, though quite aware of the difference between it and champagne, might think that the source of each is the same person or interests. The first question here then is whether, in the circumstances of this case, the statute must be read and enforced literally, and Godefroy denied all use of the name "Mumm" as the plaintiffs demand.

In S. C. Johnson & Son v. Johnson [18] it was held by a divided court that the statute should not be so read;[19] and that Congress did not intend that even actual confusion as to source, which was there established, should, without more, bar the defendant from all use of his own surname, which was also the plaintiff's, on a non-competing product.[20] Literal enforcement of the statute, to forbid Godefroy all use of the name "Mumm" as the plaintiffs demand, would operate far more harshly against him than the Court of Appeals thought it would against Johnson. The latter's was in fact a "second use" of that name, and it did not commence until many years after the "first user" had applied it to his products which, while not competing, were similar to the "second user's" and both were in common use. The facts in this case are substantially different.

From 1760 to 1899, the Rhine wine was sold under the name "P. A. Mumm & Co." In the latter year, Godefroy's grandfather, then the head of the business, whose full name was "Peter Arnold Gottlieb Hermann von Mumm," changed its name to "Hermann von Mumm'sche Kellerei" and thereafter sold the Rhine wine under that name. This was continued after his death in 1904, by his widow and son. The latter was Gode-

---

16. La Touraine Coffee Co. v. Lorraine Coffee Co., 2 Cir., 157 F.2d 115.

17. 15 U.S.C.A. § 1114(1) (a).

18. 2 Cir., 175 F.2d 176, certiorari denied 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527.

19. See also American Chicle Co. v. Topps Chewing Gum, Inc., 2 Cir., 208 F.2d 560, at page 562.

20. Judge, now Chief Judge, Clark questioned the correctness of that construction of the statute, for reasons set forth in his dissenting opinion. See also his dissenting opinion in Hyde Park Clothes, Inc., v. Hyde Park Fashions, Inc., 2 Cir., 204 F.2d 223, 226.

froy's father. His full name was "Peter Arnold Maximilian Hermann von Mumm." Godefroy says he was also "known as George." There is, however, no other evidence of this and it is clear he never used "George" in the name he applied to the Rhine wine. He did not change the firm name and until his death in 1937, he sold the Rhine wine under the name "Hermann von Mumm'sche Kellerei" adopted by his father in 1899. Thus the Rhine wine had been sold under the name "Mumm" for 177 years before Godefroy assumed control of the business. Furthermore that use had commenced more than sixty years before the name was first applied to French champagne in 1827. In 1920, it is true, the French champagne business together with the trade-marks as applied to champagne, were purchased by the French Société which, with its subsidiary, now has the exclusive right to use the marks on champagne. But "Hermann von Mumm'sche Kellerei" was not purchased. And in 1920 the French Société had no ground whatsoever for supposing that the family intended, either then or later, to discontinue that business or to discontinue the use of the name "Mumm" on its Rhine wine. As was surely to be expected, they did neither. Godefroy then in applying the name "Mumm," "von Mumm" or "v. Mumm" to the Rhine wine is clearly not a "newcomer" or a "second user" in the sense that Johnson was.

The plaintiffs contend that Godefroy's true name is "Alphonse Godefroy Hermann Mumm von Schwarzenstein";[21]

and that he fabricated the name "G. H. v. Mumm," which is almost identical with one of their trade-marks, for the sole purpose of trading on the good will attached to their champagne business. Consequently, they contend he should be restrained from using either "G. H. v. Mumm," "Mumm," "von Mumm" or "v. Mumm" on the Rhine wine and be required to use only the full name which they assert is his true one.

Godefroy was born in France in 1908, and his birth certificate records his name as "Alphonse Godefroy Hermann de Mumm." On this point, his testimony which was neither contradicted nor weakened in any way was, that he has never used or been known by the name "Alphonse"; and that in school, in business and in social life he has always used and been known only by the name "Godefroy Hermann von [or v. or de] Mumm."[22] The plaintiffs' attempt to show that French law requires Godefroy to use the name "Alphonse" was singularly unsuccessful. They also urged as controlling here, Judge Woolsey's finding that the true surname of Godefroy's father and uncle was "Mumm von Schwarzenstein." This contention is rejected. Godefroy personally was not a party to that suit. His true surname was not in issue there and a determination as to that was not necessary to the decision. From all the evidence here it seems clear that Godefroy's true surname is the one given him at his birth.[23] When he came into control of the German wine business in 1937, he acquired the good will attached to its name "Her-

21. This contention rests on the following facts. Very early in the 14th Century, probably about 1338, some member of the Mumm family was granted a patent of nobility under which he was entitled to use the name "Mumm von Schwarzenstein." How long this right was retained by the family does not appear. But undoubtedly it was either lost or abandoned in subsequent years. That name certainly had not been used for many years before the family wine business was founded under the name "Peter Arnold Mumm" in 1760. In 1873, a renewal of the ancient patent of nobility was grant-
ed to Godefroy's great-grandfather, Georges Hermann Mumm, who was then the head of both the German wine business and the French champagne business. Official birth certificates show that thereafter Godefroy's father, as well as others in the family, were named "Mumm von Schwarzenstein." Georges Hermann it will be noted never applied the latter name to either the French champagne or the German wines.

22. "v" is commonly used in place of "von."

23. See Société Vinicole de Champagne v. Mumm, 2 Cir., 143 F.2d 240, at page 241.

mann von Mumm'sche Kellerei" and the right to use that name on the Rhine wine.[24] It would be harsh indeed to deprive him of that right now.

Godefroy chose, however, not to exercise that right. On the contrary, he began at once to sell the Rhine wine under the name "G. H. v. Mumm'sche Kellerei." This, allegedly, was only to show his ownership and control of that business as his grandfather had done in 1899; and his great-grandfather in 1853 with respect to the French champagne business at Rheims. Each of these, however, had a freedom in this regard which Godefroy did not have. In 1853 and in 1899, the same person owned or, at least, controlled both enterprises and, except as other members of the family might have had power to interfere, Godefroy's great-grandfather and grandfather were free to make the changes they did or other changes. In 1937, the situation was radically different. The French Société then had the exclusive right to use "G. H. Mumm & Co." on champagne and had been using it for 17 years on their product. Godefroy, therefore, was not free to adopt "G. H. v. Mumm," even if that be his true name, for use on the Rhine wine.[25] This did more than create a possibility of confusion as to the source of his Rhine wine and the French Société's champagne. It also enabled him unfairly to trade on the good will of the Société's champagne business. That this was indeed his purpose seems the only rational inference to be drawn from what he did. I am satisfied it was his purpose. If his ownership was all he desired to show, this could have been accomplished, and with much more accuracy, by changing the name on the main label to "Godefroy Hermann von Mumm" which he says is the name he has always used and the only one by which he has ever been known in business and social life. Instead he adopted a form of his name almost identical with the plaintiffs' trade-mark; one which he had never used and which in 177 years had never been applied by any of his ancestors to the Rhine or other German wines.[26] Moreover, there is the name Godefroy used on the neck label to designate the administration—"Gutsverwaltung"—of his father's estate. In this title one would expect the name by which the decedent had been known to appear, i. e. "Hermann von Mumm." Godefroy, however, changed that also to "G. H. v. Mumm," a form never used by his father in the German wine business.

It is true that a man will hardly ever be denied all use of his name in business. But it is well established that he will be restrained from using a form which will permit him to deceive and to trade unfairly on the good will of another entitled to use the same name.[27] The use of "G. H. v. Mumm" in any form on the Rhine wine infringes the plaintiffs' trade-mark "G. H. Mumm & Co." and constitutes unfair competition with the plaintiffs.

National's defense of laches is unavailing here. While it is sufficient to defeat the claim for damages as to which, in any event, no proof whatever was offered, it is not enough to bar injunction against future infringement and unfair competition.[28]

24. Emerson Electric Mfg. Co. v. Emerson Radio & Phonograph Corporation, 2 Cir., 105 F.2d 908.

25. See Thaddeus Davids Co. v. Davids Mfg. Co., 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046; John B. Stetson Co. v. Stephen L. Stetson Co., 2 Cir., 85 F.2d 586.

26. In 1853, Godefroy's great-grandfather controlled both the champagne and the wine companies. He applied "G. H. Mumm" only to the former.

27. Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U.S. 554, 28 S.Ct. 350, 52 L. Ed. 616.

28. McLean v. Fleming, 96 U.S. 245, at page 258, 24 L.Ed. 828; Menendez v. Holt, 128 U.S. 514, at page 523, 9 S.Ct. 143, 32 L.Ed. 526; Saxlehner v. Eisner & Mendelson Co., 179 U.S. 19, at pages 39 and 40, 21 S.Ct. 7, 45 L.Ed. 60; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, at page 419, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, at page 102, 39 S.Ct. 48, 63 L.Ed. 141.

The use of "G. H. v. Mumm" will be enjoined. But Godefroy will not be denied all use of the ancient name "Mumm." The decree will provide that on the main label he may use the name "Hermann von Mumm'sche Kellerei," the right to which he acquired with the business at his father's death. If however he prefers to show his ownership of that business by use of his own name he may do so, but only under the following conditions: (a) he must use the full name by which he says he has always been known, i. e. "Godefroy Hermann von Mumm" and (b) beneath this, state in letters of the same size, color and design, the words "not connected with G. H. Mumm & Co. Société Vinicole de Champagne, Successeurs." The decree will further provide that the word "Gutsverwaltung" on the neck label must be preceded by the words "Hermann von Mumm'sche."

The plaintiffs have shown no pecuniary damage. Accordingly an accounting will not be ordered.

In view of the plaintiffs' vigorous contention that adequate protection of their rights requires that Godefroy be denied all use of the name "Mumm" unless followed by "von Schwarzenstein," it will be appropriate to consider whether the foregoing relief will adequately safeguard two other interests, not yet discussed, which they are entitled to protect. The first is that their reputation be not stained by the business practices of National or Godefroy. The second is that they be not unreasonably excluded from a market into which they might reasonably hope or expect to expand in the future.[29] The plaintiffs do not claim, nor does the evidence suggest that the first of these interests has been or is likely to be endangered in any way. As to the second, there is no claim that the plaintiffs intend or expect to go into the business of producing Rhine wine. They have not attempted this since 1920 and, viewed realistically, the likelihood of a future attempt to engage in the production of Rhine wine is too remote to matter. Apart from obvious practical difficulties of a political nature, there is a possible legal difficulty which, although it need not be resolved here, may be noted. If such an attempt were made, it seems at least doubtful that the interest of the Mumm family in protecting their ancient reputation and trade in Rhine wine under the name "Mumm" would not be held to outweigh the interests of the plaintiffs which then would indeed be newcomers in that field. This surely is a possibility which must have been apparent to the French Société when it purchased the champagne business and the trade-marks appurtenant thereto. Under the circumstances, it could hardly complain if required to confine its use of the name to champagne.

It is believed that the essential facts and conclusions have been sufficiently set forth. If, however, counsel for the parties think further findings or conclusions are necessary, these, if not inconsistent with this opinion, may be submitted within fifteen (15) days hereof. Any such proposed findings shall cite the page or pages of the trial transcript which it is claimed support them. Proposed conclusions shall cite the relevant authorities.

Submit proposed decree on five (5) days notice.

29. Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A. 1918C, 1039.