The W. E. BASSETT COMPANY,
Plaintiff,

v.

REVLON, INC., Defendant.

65 Civ. 1711.

United States District Court
S. D. New York.

Oct. 30, 1969.

As Corrected Nov. 26, 1969.

Beer, Richards, Haller & O'Neil, New York City, for plaintiff, Clifton Cooper, Stewart W. Richards, New York City, of counsel.

Blumberg, Singer, Ross, Gottesman, Diamond & Gordon, New York City, for defendant, Leon Singer, Alfred K. Kestenbaum, New York City, of counsel.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

FRANKEL, District Judge.

This is an action for trademark infringement and unfair competition in which plaintiff counts, respectively, upon the Trademark Act of 1946, 15 U.S.C. § 1051 *et seq.*, and New York State law, which probably amounts for our purposes to the same thing, see Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 545 (2d Cir. 1956) (Clark, C. J., concurring). There is over $10,000 in controversy, diversity of citizenship and no question as to the court's jurisdiction. The case has been tried and is ready for announcement of the court's findings of fact and conclusions of law hereinafter stated in accordance with Fed.R.Civ.P. 52(a).

### I.

Plaintiff, the W. E. Bassett Company, is a Connecticut corporation with its principal place of business in Derby, Connecticut. Since its incorporation in 1947, it has made and sold implements used in the clipping of fingernails and in some of the other operations subsumed under the term "manicuring." Among the tools Bassett makes, in a line which has been expanded over the years, are nail clippers, nail files, cuticle scissors and emery boards. In the marketing of these and other products plaintiff has made extensive use of the word TRIM as a trademark. In addition, it has also employed as trademarks various words or pseudo-words or combinations of words incorporating TRIM as a component, namely, TRIMCLIP, TRIMETTE, POCKET TRIM, TRIM-PAC, TRIM-TRIO, TRIMMIT, TRIMSTER and TRIM KURV. TRIM and the variants used by plaintiff over the years are the subjects of subsisting Patent Office registrations.

During the period from 1947 through 1965 plaintiff sold over 200,000,000 implements under its registered trademark TRIM. Unit sales for 1966 and 1967 were substantially higher than the annual average for that preceding period. To enhance its sales, and specifically for advertising and promotion of the TRIM mark, plaintiff spent sums ranging from about $88,000 in its fiscal year 1955–56 to over $140,000 in 1964–65.

Plaintiff markets its manicuring implements through a variety of outlets such as food stores, drug stores, supermarkets, military post exchanges and commissaries. One of plaintiff's common forms of merchandising—popular with defendant, too, as well as other purveyors of such wares—is the individual display card to which a single item (clipper, scissors, whatever) is attached and which is hung on the peg of a display rack for easy visibility and self-service by the customer. In these forms of display, as in its advertising and other forms of promotion, plaintiff has consistently and prominently featured its "TRIM" mark as well as the several combined forms in which the word-syllable appears.

The defendant, Revlon, Inc., a Delaware corporation with its principal place of business in New York City, came upon the business scene in 1933. It has grown large and prosperous over the intervening years in the manufacture and distribution of cosmetics, toiletries and beauty care products, including various implements designed for steps in the manicuring process. Although Revlon has substantial manufacturing facilities of its own, a considerable staff of trained personnel, a large complement of marketing personnel and widespread warehousing facilities, it made unsuccessful efforts before institution of this suit to acquire the business, including the trademarks, of the plaintiff.

Late in 1964 defendant commenced the marketing of an implement it designated as CUTI-TRIM, a tool designed as a cuticle trimmer, which is more or less apparent from the name defendant chose for it. According to the Revlon official responsible for the marketing of this thing, as his testimony is epitomized in defendant's post-trial memorandum, the name chosen for it was "the only suitable descriptive mark"—an assertion which reveals either an astonishingly impoverished imagination in a giant company for which advertising is so crucial or a departure from the path of absolute candor. When plaintiff objected to the name of the new implement, defendant offered to change to CUTITRIM or to CUTI-TRIM'R, or, finally, to CUTI-TRIMMER, although nobody in defendant's establishment appears to have been able to imagine or to accept anything like "cuticle trimmer," which presumably was deemed unsuitable in that it would have supplied, simply, an accurate description of what the object was supposed to be. When plaintiff refused its blessing for any of the proposed alternatives, defendant chose to adhere to its first choice, CUTI-TRIM. This lawsuit followed.

II.

Shortly after bringing the action, plaintiff moved for a preliminary injunction upon extensive affidavits, exhibits, answers to interrogatories and depositions. In his decision upon the motion Judge Palmieri found, *inter alia,* that plaintiff had had continuous and exclusive use of its trademark TRIM for over 18 years; that the mark had become distinctive of plaintiff and its manicure implements; that plaintiff's trademark registrations were valid and subsisting; that plaintiff and defendant had for some time been in direct competition in the marketing of manicuring implements; that the two companies sold their implements in the same channels of trade; that defendant had offered no reasonable explanation for its choice of the mark CUTI-TRIM in light of defendant's history of non-use of the syllable TRIM in any of its other, earlier manicuring implements; that defendant had made this (for it) novel choice of designation in full awareness of plaintiff's practices and rights; that CUTI-TRIM "sounds like and closely resembles" TRIM and "plaintiff's family of trademarks" building upon that word; and that the use of CUTI-TRIM "is likely to cause confusion or mistake as to source with plaintiff's TRIM implements, and is likely to deceive purchasers as to source." In addition, Judge Palmieri recorded that the Patent Office had rejected defendant's application to register CUTI-TRIM

because of the likelihood of confusion with plaintiff's TRIM.[1] Concluding that plaintiff would probably prevail after trial and that the requisite showing of need was amply made, Judge Palmieri enjoined defendant *pendente lite* "from any further use of 'CUTI-TRIM' or any other mark similar thereto, or to plaintiff's trademark 'TRIM' in the advertising or sale of manicuring implements."

Defendant appealed. With a modification which gives rise to grave problems hereinafter treated (see VI, *infra*), the Court of Appeals affirmed. 354 F.2d 868 (January 3, 1966). The Court agreed with defendant's contention that TRIM is a "weak mark"—being "primarily a term that is descriptive of the function performed by the products so marked rather than the origin of those products." *Id.* at 871. It went on to rule, however, that "Judge Palmieri had ample grounds for concluding that Bassett's 'Trim' mark has in all probability acquired secondary meaning." *Id.* It found, contrary to defendant's assertions, "no evidence that Bassett has permitted competitors to dilute its exclusive use of 'Trim' in the manicure implement field." *Id.* In light of the parties' "direct competition in the manicure field," the appellate Court found it at best indecisive that Bassett was not marketing, or imminently planning to market, a cuticle trimmer. "If Revlon markets a new manicure implement," the Court concluded, "it is required to choose a mark that will not hinder Bassett in later competing under its 'Trim' mark and that will not confuse the public as to the source of Revlon's own innovation." *Id.* at 872. The Court endorsed Judge Palmieri's view that Revlon had probably violated that standard. *Id.* Briefly dismissing certain affirmative defenses that have been renewed with equal futility at this final stage (see IV,

*infra*), the Court of Appeals affirmed as modified.

### III.

While the trial generated a substantial record, the result is a set of ultimate findings largely similar to those made by Judge Palmieri on the motion for preliminary relief.

Recalling that the common law and the statute prescribe the test as "likelihood of confusion" rather than the demonstrated fact of actual confusion, 15 U.S.C. § 1114(1); Miss Universe, Inc. v. Patricelli, 408 F.2d 506, 509 (2d Cir. 1969); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 542 (2d Cir. 1956), I find, if only by a narrow preponderance, that plaintiff has established this aspect of its case. Bassett has pursued a course of steady promotion over the years calculated to produce a noticeable measure of secondary meaning for TRIM. The goal of such activities is an effect not always plainly rational or readily identifiable; as Mr. Justice Frankfurter put it, the effort of the trademark owner is to "impregnate the atmosphere of the market with the drawing power of a congenial symbol." Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942). Considering that, and all the circumstances of the case, it is more likely than not that Bassett's persistent endeavors for so long a period have produced some substantial effect of the kind intended upon the consciousness (or unconsciousness) of consumers. Cf. Miss Universe, Inc. v. Patricelli, *supra*, 408 F.2d at 509; Spice Islands Co. v. Spice Land Prods. Inc., 262 F.2d 356, 357 (2d Cir. 1959); Maternally Yours, Inc. v. Your Maternity Shop, Inc., *supra*, 234 F.2d at 544; Beef/Eater Restaurants, Inc. v. James

---

1. Insofar as Judge Palmieri's findings summarized in the two sentences ending with this footnote are not expressly repeated elsewhere in this memorandum, I record that they are now reaffirmed upon the record made before me. Insofar as the summarized findings cover more than strict historical "fact"—e. g., the findings of secondary meaning and likelihood of confusion—I am in agreement with them.

Burrough Limited, 398 F.2d 637, 639–640 (5th Cir. 1968).

Having appraised essentially the same materials as those heretofore considered, I come to the conclusion reached by the Patent Office (in refusing defendant's attempt to register CUTI-TRIM) and by Judge Palmieri that Revlon selected a name too closely similar to, and plainly likely to cause confusion with, plaintiff's mark.

■ Considering the time that has elapsed since the preliminary injunction, the absence of any evidence of actual confusion is a point upon which defendant understandably relies. Cf. Paul Sachs Originals Co. v. Sachs 325 F.2d 212, 216 (9th Cir. 1963); Maas & Waldstein Company v. American Paint Corp., 288 F.2d 306, 307 (8th Cir. 1961). But the reliance is excessive. Evidence of actual confusion is by no means easy to come by. See My-T-Fine Corporation v. Samuels, 69 F.2d 76, 77 (2d Cir. 1934). It is, at any rate, not indispensable. It is at most an evidentiary factor of some weight for inclusion in the balance ultimately to be struck. Miss Universe, Inc. v. Patricelli, *supra*, 408 F.2d at 509; Maternally Yours, Inc. v. Your Maternity Shop, Inc., *supra*, 234 F.2d at 542; Time, Inc. v. Ultem Publications, Inc., 96 F.2d 164, 165 (2d Cir. 1938); Aloe Creme Laboratories, Inc. v. Texas Pharmacal Co., 335 F.2d 72, 75 (5th Cir. 1964).

■ Similar observations apply to defendant's argument from the fact that Bassett has not in the years since the preliminary injunction produced, or moved noticeably toward introducing, a cuticle trimmer of its own. The area of possible confusion may be lessened on this score, and the immediate harm to plaintiff may be less appreciable. But the potential remains for confusion of the public as to source, and the case is at least as strong as Judge Palmieri found it for an inference that defendant has followed a course likely to result in its trading upon the established good will plaintiff has attached to its mark. Cf. Admiral Corp. v. Penco, Inc., 203 F.2d

517, 520–521 (2d Cir. 1953); Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 499 (2d Cir. 1962); Yale Electric Corp. v. Robertson, 26 F.2d 972, 973–974 (2d Cir. 1928); Beef/Eater Restaurants, Inc. v. James Burrough Limited, *supra*, 398 F.2d at 639.

■ A somewhat related point in defendant's favor has been weighed and found insufficient to tip the scales. Defendant's advertising to promote the name "Revlon" has been on a scale much larger than the comparable activities of plaintiff. Stressing this, defendant goes on to rely upon the fact that its display cards and other devices uniformly and prominently feature its well-known name along with any specific product designations such as the name CUTI-TRIM here in question. But the conclusion that this negates any likelihood of confusion does not follow. Having insisted upon proceeding with a name that threatened likely confusion, Revlon could well have been seeking—as it evidently did when it undertook to buy plaintiff's business—to couple the benefits of the TRIM mark with the powers of its own name. Whether this was a specific and wicked goal or not, it was the kind of invasion against which plaintiff was entitled to be protected in the exploitation of its own registered mark. Plaintiff's rights to the value and integrity of its mark were not erased or diminished because the likelihood of confusion was created by what may have been a more powerful and famous competitior. See, e. g., Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195 (1938); Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602 (2d Cir. 1952), cert. denied, 345 U.S. 909, 73 S.Ct. 650, 97 L.Ed. 1345 (1953); Q-Tips, Inc. v. Johnson & Johnson, 206 F.2d 144 (3d Cir. 1953), cert. denied, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1954). The power of the name "Revlon" could not insure against—but might indeed promote—confusion as to the source indicated by TRIM or variants of TRIM. While the kinds of confusion may not be determinable with sure precision, the un-

certainty and the ambiguous possibilities are among the evils against which the trademark owner is to be safeguarded. Cf. Stix Products, Inc. v. United Merchants & Mfrs. Inc., 295 F.Supp. 479, 496–497 (S.D.N.Y.1968).

Defendant also undertook upon the trial, as it had in opposing the preliminary injunction, to show that third-party registrations of "Trim" or marks resembling it diluted plaintiff's exclusive use or impaired the demonstration of secondary meaning. The full record is not more persuasive for defendant on this than was the showing in the motion part. Plaintiff's claim of substantial exclusiveness in its field of manicure implements (meaning, essentially, tools or implements rather than lotions and the like to be applied to the nails) remains ample to sustain its position.

Preponderating against the factors pressed by defendant are those that impressed Judge Palmieri and the Court of Appeals and which are found, finally, to prevail after trial. Bassett's investments in the production of secondary meaning have been noted. Defendant's adoption of the potentially confusing mark CUTI-TRIM remains without satisfactory explanation. The purported explanation—that the imagination Revlon could marshal was capable of producing no other name—is incredible enough to promote an inference contrary to the intended one. Cf. LaTouraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 118–119 (2d Cir.), cert. denied, 329 U.S. 771, 67 S.Ct. 189, 91 L.Ed. 663 (1946); My-T-Fine Corp. v. Samuels, supra, 69 F.2d at 77; George W. Luft Co. v. Zande Cosmetic Co., 48 F.Supp. 602, 604–605 (S.D.N.Y.1942), aff'd, 142 F.2d 536 (2d Cir.), cert. denied, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944). Revlon's actions and contentions are surrounded by an aura of indifference to plaintiff's rights and a smug willingness to determine unilaterally that the good will plaintiff had sought to foster could safely be treated as a nullity. These elements amount to a species of bad faith and wrongful intent. Defendant, deliberately and un-

necessarily duplicating plaintiff's mark, acted in a way that was calculated to appropriate or otherwise benefit from the good will plaintiff had nurtured. Defendant's conduct, at a minimum, evinced a cavalier disregard for ready means of avoiding such a "risk" to plaintiff. See Triangle Publications, Inc. v. Rohrlich, 167 F.2d 969, 973 (2d Cir. 1948).

■ The unprecedented adoption by defendant of a mark featuring TRIM was accomplished in the teeth of a Patent Office refusal to register CUTI-TRIM because of likely confusion with plaintiff's mark. That determination, if not binding here, has substantial weight, as it should have had with defendant. Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657 (1894); Aloe Creme Laboratories, Inc. v. Texas Pharmacal Co., supra, 335 F.2d at 74; Radio Corp. of America v. International Standard Electric Corp., 232 F.2d 726 (3d Cir. 1956); Esso Standard Oil Co. v. Sun Oil Co., 97 U.S.App.D.C. 15, 229 F.2d 37, 40, cert. denied, 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956); Yale Electric Corp. v. Robertson, supra, 26 F.2d at 973. Defendant stresses that its efforts to reach agreement with plaintiff on supposedly less confusing names for its cuticle trimmer evidence its good faith. The argument is at best double-edged. These efforts show the feasability of a more cautious regard for plaintiff's rights than defendant elsewhere treats as necessary, or even possible. Finally, the adherence to CUTI-TRIM recognized as the name most likely to offend, after plaintiff refused to sanction and consent to supposedly less troublesome designations, reveals an arrogant disregard of plaintiff's and the public's interests.

■ There is, in short, powerful evidence of an expert judgment by Revlon itself that CUTI-TRIM created a substantial likelihood of confusion with plaintiff's marks. Whatever might be true without this element, it serves, when considered with the other evidence in the case, to sustain plaintiff's burden of es-

tablishing its claims of infringement and unfair competition. Cf. Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 411 F.2d 1097, 1100–1101 (2d Cir. 1969); Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 702 (2d Cir. 1961); Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755 (2d Cir. 1960); Time, Inc. v. Ultem Publications, Inc., 96 F.2d 164, 165 (2d Cir. 1938); My-T-Fine Corporation v. Samuels, *supra*, 69 F.2d at 77, 78; Stix Products, Inc. v. United Merchants & Mfrs. Inc., 295 F. Supp. 479, 497–498 (S.D.N.Y.1968); Wesson v. Galef, 286 F. 621, 625 (S.D.N.Y.1922).

## IV.

Defendant presents three contentions which are raised both defensively as claims of unclean hands and unfair competition, and offensively as counterclaims. Briefly summarized, these are:

(1) That plaintiff misbehaved in advertising *all* its products as American made and "manufactured" in its own Connecticut plant when

 (a) it packaged and marketed under its own name and mark scissors made in Germany and Italy, and

 (b) it merely assembled, or in some instances wrapped and marked, rather than "manufacturing," some of the products sold under its name.

(2) That plaintiff's self-service cards described its products as being "Mfd. under [designated] U. S. Patents * * * and other patents pending" whereas a number of the products were not patented.

(3) That plaintiff used the terms "sapphire" and "jeweled" to describe its nail file containing no natural sapphires or jewels.

These points have been argued with vigor and learning. But they lack merit.

■ All three contain common and fatal defects apart from the specific infirmities mentioned later on. None is

sufficiently related to the claim in suit to warrant its use as a shield by defendant. Republic Molding Corp. v. B. W. Photo Utilities, 319 F.2d 347, 349, 351 (9th Cir. 1963); Jacoby-Bender, Inc. v. Jacques Kreisler Mfg. Corp., 287 F.Supp. 134 (S.D.N.Y.1968); Landis Mach. Co. v. Parker-Kalon Corp., 73 F.Supp. 421, 423 (S.D.N.Y.1947), rev'd on other grounds, 190 F.2d 543 (2d Cir. 1951). In each instance, the alleged misconduct was not intended to deceive, was not likely to deceive and was not shown to have deceived the consuming public. Jacobs v. Beecham, 221 U.S. 263, 273–274, 31 S.Ct. 555, 55 L.Ed. 729 (1911); Wilson Jones Co. v. Gilbert & Bennett Mfg. Corp., 332 F.2d 216, 218 (2d Cir. 1964); Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641, 648–649 (3rd Cir. 1958); Freeman Mfg. Co. v. Federal Department Stores, Inc., 195 F.Supp. 951, 953 (E.D.Mich. 1961). And the practices complained of were all discontinued or corrected before trial. Q-Tips, Inc. v. Johnson & Johnson, 207 F.2d 509, 511–512 (3rd Cir. 1953), aff'g. 108 F.Supp. 845 (D.N.J. 1952), cert. denied, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954); Fund of Funds, Ltd. v. First American Fund of Funds, Inc., 274 F.Supp. 517, 519 n. 1 (S.D.N.Y.1967).

■ Turning to a few specifics, the "Made in America" advertising was basically true of plaintiff's goods. The foreign scissors, imprinted with their country of origin, arrived late on the scene and were the subject of a harmless lapse in coordination with plaintiff's advertising agency. As Judge Palmieri found, the mistake was unintentional and *de minimis*.

■ Plaintiff's description of itself as "manufacturer" was at worst arguably mistaken for products it put together from components made elsewhere.

■ The discontinued self-service cards perpetrated at worst a minuscule inaccuracy. Only the patented items were themselves imprinted with patent notices. There is no indication that any

relevant segment of the public was or could have been hurt.

◼ Defendant's target is a 79¢ nail file when it looses its bolt that plaintiff's "use of the terms 'sapphire' and 'jeweled' * * * to describe its nail file was a false representation that it contained genuine, natural sapphire." This, with all respect to the generally impressive performance of able counsel, is silly.

### V.

It has not been disputed—at any rate, there is no room for dispute—that a decision for plaintiff on its charge of infringement and unfair competition would lead to a permanent injunction continuing the restraints under which Revlon has been operating since shortly after the affirmance of Judge Palmieri's decision early in 1966. It would appear, moreover, as a practical matter that the preliminary injunction has amounted in some substantial degree to a "permanent" one since Revlon has for so long been compelled to market its cuticle trimmer without trenching upon the mark TRIM or its variants.

The result is that the really earnest controversy about relief has centered upon plaintiff's contention, rested heavily upon Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co., 349 F.2d 389 (2d Cir. 1965), cert. denied, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966), that Revlon should be called to account for its profits on all sales of cuticle trimmers which bore the designation CUTI-TRIM. For reasons outlined under the present heading, this broad position does not prevail. As will appear in the next section of this memorandum, however, plaintiff may be awarded a substantial portion of the accounting it seeks because of Revlon's grave misconduct in (a) misleading the Court of Appeals in its representations leading to a stay of the preliminary injunction, and (b) violating the terms of that injunction upon the basis of a palpably untenable "interpretation" of what it meant.

◼ As plaintiff argues, Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co., supra, has quickly become a "leading case" in the "more recent trend [which] bases the accounting of profits on the equitable concepts of restitution and unjust enrichment." Maier Brewing Company v. Fleischmann Distilling Corp., 390 F.2d 117, 121 (9th Cir.), cert. denied, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968). Monsanto implements the salutary view, which binds this court in any case, that the absence of direct competition between the parties is no bar to an accounting where "the public interest in deterring fraudulent sales practices requires that such an accounting be allowed * * *." 349 F.2d at 390. The emphasis there and in cases reflecting the same "trend" is upon the degree of "fraud," of potential or actual deception of the public, and of apparent need for deterrence of the offender—in short, upon the relevant public interests and the attendant equities.

◼ As Monsanto itself made clear, the controlling statute, § 35 of the Lanham Act, 15 U.S.C. § 1117, was written in terms that "would seem to give a district court the broadest kind of discretion in tailoring the plaintiff's recovery, whether in damages or by way of an accounting, to the facts of the particular case." 349 F.2d at 392. It seems clear, in short, that equitable considerations are to be weighed; that these may point to an accounting whether or not the parties compete in the disputed area; but that an accounting is not automatic, or necessarily justifiable, when an "injunction will satisfy the equities of the case." Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 132, 67 S.Ct. 1136, 1140, 91 L. Ed. 1386 (1947); see also Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 545 (2d Cir. 1956); Dad's Root Beer Co. v. Doc's Beverages, Inc., 193 F.2d 77, 82–83 (2d Cir. 1951). Refusal to grant an accounting may be the sound course even where the defendant is guilty of unfair competition as well as infringement. Champion Spark Plug Co.

v. Sanders, *supra*, 331 U.S. at 132, 67 S. Ct. 1136.

 Weighing the equities here as of the time before the preliminary injunction, the court finds no sufficient ground for an accounting. This is a case altogether different from that of the "commercial racketeer" (349 F.2d at 396) held to an accounting in *Monsanto*. While defendant acted in violation of plaintiff's legal rights in its registered trademark, there appears to have been no fraud, no deliberate effort at palming off, and no strong purpose to accomplish such deceptions of the public. It is pertinent again that defendant appears to have relied upon the magnetism of its own name rather than the lesser appeal of plaintiff's as its means of attracting custom. Granted that the defendant, cast in the role of "poacher," has the burden of proving this factor, Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 206, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942), the burden is met upon the record of this case as a whole. Indeed, this element was mentioned and underlined by our Court of Appeals when it modified the preliminary injunction to allow defendant to market its existing stocks.[2] As that Court noted upon the facts then appearing (which do not seem essentially different now) "the likelihood of tarnishment [was] slight. Moreover, since Bassett [did not and] does not produce a cuticle trimmer, there [was] little likelihood of immediate confusion." 354 F.2d at 872.

 In sum, considering all the circumstances, this court concludes that an accounting for the period before the preliminary injunction would be an unjustifiably harsh and inequitable sanction. It will not be awarded.

### VI.

We come, then, to long-postponed subjects raised by plaintiff's supplemental complaint attacking defendant's conduct beginning with the proceedings upon appeal from Judge Palmieri's award of a preliminary injunction. As has been suggested and will now appear, the findings and conclusions on this aspect of the case may tend to neutralize in substantial measure the preceding ruling on the claim for an accounting.

On November 22, 1965, defendant applied to the Court of Appeals for a stay of the preliminary injunction. In the key affidavit supporting the application Mr. Joseph P. Dobkins, defendant's Marketing Products Manager for Implements, swore, *inter alia*, as follows:

"2. Unless the preliminary injunction is stayed pending appeal, defendant will sustain immediate and irreparable harm.

"3. The defendant has in its inventory over 80,000 fully assembled units of its cuticle trimmer upon which there is permanently embossed the legend:

'REVLON "CUTI-TRIM" U.S.A. 2070'

"It is impossible to eradicate the words 'CUTI-TRIM' therefrom without gouging out these words from the handle of the completed implement, thereby so mutilating these cuticle trimmers as to render them defaced, second-hand products. Thus, it would become necessary to junk all of these 80,000 units since it is impossible to separate the cutting head from the handle of the completed cuticle trimmer. These articles were all manufactured and assembled prior to the rendition of the Court's decision and in accordance with Revlon's regular production schedules. In addition to these completed cuticle trimmers, Revlon has in its inventory in excess of 100,000 'blister' packages or 'bubble' cards and 12,000 related counter displays on which the words 'CUTI-TRIM' are imprinted and which obviously would be required to be scrapped if a stay of the preliminary injunction pending the appeal is not granted.

---

2. The fact that defendant misbehaved in obtaining this modification is treated, and made the basis of an accounting, below.

It does not for present purposes alter the force of what the Court of Appeals observed.

These materials were likewise procured by the defendant prior to the Court's decision and in accordance with Revlon's normal purchasing procedures.

"4. A period of three to four weeks is required for defendant Revlon to replace the 80,000 completed cuticle trimmers now in inventory. This would result in the loss to Revlon of the opportunity of making any sales of its cuticle trimmer during this period of replenishment of its inventory.

"5. If the preliminary injunction is permitted to become effective pending the appeal, thereby preventing defendant of [sic] disposing of its existing inventory of cuticle trimmers in the ordinary course of trade, defendant Revlon will sustain a monetary loss in excess of $50,000."

The stay was granted. The expedited appeal was then argued on December 6, 1965.

Before that argument, however, with the stay still in effect, interested officials of defendant consulted on the course to be followed in the event of an affirmance. On November 30, before argument of the appeal, Mr. Dobkins addressed a memorandum to defendant's house counsel, reading in significant part as follows:

"Should our appeal of the 'Cuti-Trim' injunction fail to be upheld by the Federal Court of Appeals, we will be prepared, on December 6 if necessary, to make the following revisions to the 'Cuti-Trim' product, and to packaging and display materials:

"I Product

A. For stock on hand, we will buff off the current gold-stamping ('Revlon Cuti-Trim USA 2070') and re-stamp without the words 'Cuti-Trim.' (Sample enclosed.)

\* \* \* \* \* \*

"II Packaging

A. On the current 'hourglass-shape' self-service front card and back label (now being printed), the words 'Cuti-Trim-Cuticle Trimmer' have been replaced by the words 'Cuticle Trimmer' only and the copy beneath the illustration on the back label which mentioned 'Cuti-Trim' has been re-set to eliminate the trademark completely."

This remarkable document was never called to the attention of the Court of Appeals or of plaintiff until long afterwards, so there was no timely occasion for anyone to consider whether the assertedly innocent explanation since tendered should be deemed acceptable, or what impact, if any, this seeming self-contradiction should have upon the stay.

In the trial defendant has produced earnest and detailed testimony to indicate that Dobkins' optimistic forecasts of November 30 were gross mistakes; that the buffing he described was not really possible then and did not become possible until a year later; and that the Court of Appeals was, after all, not misled in any way. Plaintiff has adduced refuting evidence which is found to be credible and effective in all relevant respects.

■ This court finds that the Dobkins memorandum of November 30 accorded with the facts and with the mechanical possibilities that were then known or promptly knowable to defendant's technical staff. Even if this were not so, the failure to disclose the irreconcilable conflict between the Dobkins filed affidavit of November 19 and the Dobkins memorandum of November 30 was an imposition upon the Court of Appeals and upon plaintiff.

The stay thus obtained for the sale of 80,000 implements marked CUTI-TRIM was the product of a fraud upon the Court. The result is that the stay may not be invoked as a shield and that the sales made under its aegis amounted to a contempt of court. Alternatively, these sales are in a highly pertinent sense grossly inequitable acts of fraud and deception from which defendant may not be left to profit and for the prosecution of which plaintiff should recover not less than its expenses and reasonable counsel fees.

The unpleasant matters under this final heading are not yet concluded. Responding to the Dobkins affidavit of November 19, the Court of Appeals modified the preliminary injunction to allow marketing by defendant of the "80,000 fully assembled units" embossed with the CUTI-TRIM legend which the affidavit described as being "in [defendant's] inventory" at that time. The meaning of what the Court allowed, in light of what it was asked to allow, should not have seemed obscure. But later developments make it useful to write down the Court's words before stating what seems in context to be their unmistakable meaning and defendant's inexcusable "misunderstanding."

Having outlined its reasons for concluding that plaintiff would not be irreparably hurt if defendant was "permitted merely to market its existing stocks of 'Cuti-Trim'" (354 F.2d at 872), the Court of Appeals proceeded to the passage now in issue, saying (*id.* at 872–873)

"For these reasons, we *modify the preliminary injunction to permit Revlon to market up to 80,000 existing cuticle trimmers and bubble pack displays that bear the mark 'Cuti-Trim.'* [5] However, Revlon is enjoined *pendente lite* from any other use of 'Cuti-Trim' or any mark similar to the plaintiff's trademark 'Trim' in the advertising or sale of manicuring implements or goods of the same general class. Revlon is also enjoined from undertaking any additional consumer advertising of the 'Cuti-Trim' mark."

"5. On November 19, 1965, the date of Judge Palmieri's order, Revlon averred that it had 80,000 fully assembled, unsold cuticle trimmers bearing the 'Cuti-Trim' legend. To prevent Revlon from profiting by any possible inventory build-up during the period of the stay granted by this court, we limit our modification to permit the marketing of only 80,000 additional 'Cuti-Trim' implements."

3. Charges of contempt are also predicated upon some instances of advertising which were literally and undisputedly forbidden by the terms of the preliminary injunc-

Under the purported authority of that language and the stay it reflected pending the appeal, defendant sold, not 80,000, but approximately 148,000 implements containing the outlawed legend. This is now said to have been allowable because, on defendant's asserted construction, "defendant was permitted to continue to *manufacture* and sell and to distribute" such items (defendant's proposed finding No. 29, emphasis added) as a result of the stay pending appeal. The assertion is made in the face of the appellate Court's explicit statement of its purpose to "prevent Revlon from profiting by any possible inventory build-up during the period of the stay," and the Court's use of plain words aptly designed to suit that plainly appropriate end.

■ It is not edifying to pursue this matter further. Defendant's construction of the stay, apart from the fatal deception in its procurement, is not tenable. All of the sales of approximately 148,000 implements after Judge Palmieri's decision were lawless and contumacious.[3]

■ The question remains as to appropriate sanctions, having centrally in mind the burden to plaintiff of proving the violations. Plaintiff argues, persuasively, for an award of its expenses incurred in this aspect of the proceeding. There is ample authority for such an award, including attorneys' fees, Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), citing Toledo Scale Co. v. Computing Scale Co., 261 U.S. 399, 426–428, 43 S.Ct. 458, 67 L.Ed. 719 (1923); Babee-Tenda Corp. v. Sharco Manufacturing Co., 156 F.Supp. 582 (S. D.N.Y.1957), and this court's judgment will provide for it as one measure of recovery available to plaintiff.

■ While an award on this basis is all plaintiff seeks for the unlawful and contumacious sales, an alternative measure of recovery should and will be al-

tion. These are found to have been unintentional and trivial. The charges in these respects are not sustained.

lowed. With respect to the 148,000 or so items here in question, all the basic policies favoring an accounting under 15 U.S.C. § 1117, as explicated in Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co., *supra*, would appear to come into play. The violations of the preliminary injunction were clear and deliberate. There was deception, not in the usual trademark sense, but upon the Court engaged in enforcement of the Lanham Act. The public interest assaulted by such misconduct is not slighter than the interest in avoiding deception of consumers. In such circumstances, a court of equity, mindful of its traditions of flexibility, should take its lead from the Congress and adapt its relief along the lines of the closely apposite statutory policy. See Sunbeam Corp. v. Golden Rule Appliance Co., 252 F.2d 467, 470 (2d Cir. 1958); cf. Stone, The Common Law in the United States, 50 Harv.L.Rev. 4, 13–16 (1936). Moreover, the general principles governing civil contempt proceedings support an award of the kind indicated by the specific statute pertinent here. Leman v. Krentler-Arnold Co., 284 U.S. 448, 455–457, 52 S.Ct. 238, 76 L.Ed. 389 (1932); Sunbeam Corp. v. Golden Rule Appliance Co., *supra*, 252 F.2d at 471–472 (concurring opinion of L. Hand, J.); Textag Co. v. Hayslip, 192 F.2d 435, 437–438 (5th Cir. 1951); Town v. Willis, 89 F.Supp. 437, 440 (W.D.Mo.), aff'd, 182 F.2d 892 (8th Cir. 1950). But see National Drying Machinery Co. v. Ackoff, 245 F.2d 192, rehearing denied, *id.* at 195 (3rd Cir. 1957) (en banc), cert. denied, 355 U.S. 832, 78 S.Ct. 47, 2 L.Ed. 2d 44 (1957).

Accordingly, the accounting earlier denied to plaintiff should be made available as an alternative measure of its recovery for the sale of the approximately 148,000 items after the issuance of the preliminary injunction.

The two modes of computing plaintiff's recovery are to be authorized as alternatives. Plaintiff, as the injured party, should have some effective method of implementing the choice. An obvious, though not obviously most desirable,

means is to have proof made before a special master on both bases. That course will be followed if it proves unavoidable. In an effort to obviate such a burdensome procedure, however, the parties will be required, in advance of (and possibly in lieu of) any proceedings before a special master, to exchange relevant information so that an intelligent choice may be possible in a more expeditious way. Specifically, the court will direct that within twenty (20) days from this date (or such extended period as may be determined by agreement of the parties or further order of the court), the parties will file and exchange information as follows:

(1) Plaintiff will supply a detailed affidavit computing the recovery it claims for disbursements and attorneys' fees. The account should be concrete and specific, condescending upon such matters as hours and dates of work, proposed hourly rates, and particular disbursements.

(2) Defendant will supply a similarly detailed affidavit showing, as precisely as possible, the number of implements marked "CUTI-TRIM" sold after the date of the preliminary injunction and what it claims to compute as the correct unit profit and total profit on these, having in mind the burden imposed upon defendant under 15 U.S.C. § 1117 to "prove all elements of cost or deduction claimed."

Within ten days after the filing of the foregoing affidavits, each side will submit a proposed form of decree, with supporting memorandum, based upon the above-stated findings and conclusions. The decree will include, of course, an appropriate form of permanent injunction. Depending upon what is learned from the exchange of affidavits, it may or may not be necessary to provide for the appointment of a special master to conduct an accounting proceeding. On this and other questions, the court will await the

guidance of counsel in their proposed decrees, memoranda, and, if it seems necessary or desirable, a hearing subsequent to those written presentations.