**CHANDON CHAMPAGNE CORPORATION, Societe Anonyme Maison Moet & Chandon and Schieffelin & Co., Plaintiffs-Appellants,**

v.

**SAN MARINO WINE CORPORATION, doing business as Pierre Perignon Champagne Co., Defendant-Appellee.**

No. 254, Docket 28419.

United States Court of Appeals
Second Circuit.

Argued May 6, 1964.

Decided July 17, 1964.

Alex Friedman, New York City (Blum, Moscovitz, Friedman & Blum, New York City), for plaintiffs-appellants.

Joseph J. Shapiro, New York City, for defendant-appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

Dom Pierre Pérignon, cellar-master of the Abbey of Hautvillers in Champagne, is popularly credited with discovering, more than two centuries ago, the process for making the wine that has brought fame to the region and delight to the world. We are here called upon to determine whether a French vintner, who has honored him by designating one of France's finest champagnes as "Dom Pérignon," may bar use of the Pérignon name by a New York producer. We affirm the judgment for the defendant, although we think the case somewhat closer than did the district judge, 222 F. Supp. 396 (1963), and our reasons differ from his.

The plaintiffs are S. A. Maison Moet & Chandon, a French corporation producing and bottling champagne in Champagne; Chandon Champagne Corporation, its American subsidiary; and Schieffelin & Co., its American distributor. Moet & Chandon, which owns the Abbey of Hautvillers, has long used the name "Dom Pérignon" on its most choice and expensive champagne. This is shipped in a slender-necked, low-shouldered bottle, formerly sealed with a heavy black wax; the label is in the form of a shield with a beige background, bearing, in black script, the words:

Champagne

Cuvée Dom Pérignon

followed by the vintage and, in shipments to this country, the words "Produce of France." Sales in the United States began in 1936 but were exceedingly small,

amounting to only a few hundred cases by 1939 when they ceased as a result of World War II. Shipments were resumed in 1948; sales averaged around 1000 cases a year through 1954 and grew to some 4500 in 1960 and 6000 in 1961. Application to the Patent Office to register the trade-mark was made in November, 1954, and granted in September, 1956.

Several pertinent things had happened before that. In May, 1934, an Arthur Lesser had registered Dom Perignon for champagne, claiming use in this country since 1876; this registration expired in May, 1954, 15 U.S.C. § 1058(a), and the record tells nothing more. In 1939 the defendant, San Marino Wine Corporation, a New York corporation, began to make wine on a mass production basis, and to sell New York State champagne and other sparkling wines under the name "Pierre Perignon." Giulianelli, its president, who had grown up in the wine business in San Marino, testified that he chose the name because Pierre Pérignon was "the father of the champagne," and that he did not know of Moet & Chandon's use of "Dom Pérignon" then or, indeed, until he received a letter of protest in 1957. San Marino registered the trade-mark "Pierre Perignon" with the Secretary of State of New York in 1940, and with the Patent Office in March, 1943, republishing this registration under the Lanham Act in April, 1948. The federal registration was cancelled in September, 1954 due to the failure of San Marino's then attorney to file the affidavit of continued use required by 15 U.S.C. § 1058(a), but the use of the mark continued. Giulianelli testified that a thousand cases of "Pierre Perignon" champagne or sparkling wine were sold in 1940 and at least that many in every year thereafter; recorded interstate sales, based on figures which were incomplete in some instances, were 2250 cases in 1943 but then appear to have declined and, save for a bulge in 1955, did not again approach that figure until 1959 and 1960 when they approximated 3000 cases, with nearly twice that amount in 1961. In 1956 defendant began to do business under the name of

Pierre Perignon Champagne Co. It markets its champagne in the conventional type bottle; the cork is covered with gold paper; for the last few years the neck band has borne the words "Special Cuvee"; and the yellow rectangular label carries the following in black print:

PIERRE PERIGNON
NEW YORK STATE
CHAMPAGNE
NATURALLY FERMENTED IN THE BOTTLE
PRODUCED AND BOTTLED BY
PIERRE PERIGNON CHAMPAGNE CO.
NEW YORK, N. Y.

The District Court dismissed the complaint for lack of proof that defendant's trade-mark "has resulted or may result in confusion in the minds of consumers to the detriment of the party to which the name belongs." The court was impressed by the absence of evidence that anyone intending to buy one of the finest and dearest of French champagnes had been or was at all likely to be deceived into accepting a low-priced American vintage whose appearance did not resemble the imported article. In other words, the judge thought that although the parties sold products described by the same noun, these were in fact different.

Although we do not disagree with this analysis as a factual matter, it embodies too restricted a notion of the protection that Congress afforded. A registered trade-mark is safeguarded against simulation "not only on competing goods, but on goods so related in the market to those on which the trade-mark is used that the good or ill repute of the one type of goods is likely to be visited upon the other." ALI, Restatement 2d, Torts (Tent. Draft No. 8) (April 1963), § 731, comment a, p. 104; S. C. Johnson & Son v. Johnson, 175 F.2d 176, 180 (2 Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); Browne-Vintners Co. v. National Distillers and Chem. Corp., 151 F.Supp. 595, 603 (S.D. N.Y.1957) [G. H. Mumm & Co. Champagne v. G. H. v. Mumm Rhine wine]. On this very issue of domestic versus French champagne, with the domestic product in that case marketed under a deceptively similar label, Judge Learned Hand, taking what seems a rather personal form of judicial notice, noted that "especially as evening wears on, the label, and only a very casual glance at the label, is quite enough to assure the host and his table that he remains as free-handed and careless of cost as when he began," and that "At such stages of an entertainment nothing will be easier than for an unscrupulous restaurant keeper to substitute the domestic champagne." G. H. Mumm Champagne v. Eastern Wine Corp., 142 F.2d 499, 501 (2 Cir.1944). Even in less bibulous circumstances, one who was served the defendant's mass-produced "Pierre Perignon" with only partial disclosure of its identity by his host, or who knowingly ordered the domestic variety under the mistaken assumption that it was made with the skill and taste employed at supposedly related French vineyards, would be more likely to turn thereafter on appropriate occasions to another high priced competitor rather than to Dom Pérignon. Hence we would have no hesitancy in granting relief if plaintiffs had clear priority to the mark in the United States, if defendant had knowingly trampled on their rights, and if plaintiffs had moved promptly to vindicate them under 15 U. S.C. § 1114(1).

But that is not this case. In contrast to patent and copyright law, the concept of priority in the law of trade-marks is applied "not in its calendar sense" but on the basis of "the equities involved." 3 Callmann, Unfair Competition and Trade-Marks, 1189, 1198-99 (2d ed.1950). The United States pre-war sale of a few hundred cases of plaintiffs' Dom Pérignon—just where the record does not show—was scarcely enough to reserve this unregistered mark for all time against others who might also have the idea of naming their product after the putative father of champagne. See 3 Callmann, supra, § 76.4. It was testified that plaintiffs' use of "Dom Pérignon" as a trade-mark began only in 1936; we see no reason to doubt Giulian-

elli's testimony that when in 1939 he took Pierre Perignon's name as a trade-mark, he was unaware of plaintiffs' earlier use of it. Although plaintiffs' forced war-time withdrawal from the American market was not an abandonment of the mark, 3 Callmann, *supra*, at 1345–46; Stern Apparel Corp. v. Raingard, Inc., 87 F. Supp. 621 (S.D.N.Y.1949), the defendant's interests arising from its continued innocent use during the war years cannot be wholly disregarded. Even so, plaintiffs might not have been too late had they acted promptly after 1945. But although they had reentered the American market by 1948, they did nothing with respect to defendant's use of "Pierre Perignon" for a decade and then waited another three years after their protest before filing suit. See Fruit Industries, Ltd., v. Bisceglia Bros., 101 F.2d 752 (3 Cir.), cert. denied, 307 U. S. 646, 59 S. Ct. 1043, 83 L.Ed. 1526 (1939).

 Plaintiffs would account for their delay on the basis that they did not become aware of defendant's use until early in 1957 and that there was no reason for them to be so since the markets for imported and domestic champagne were still distinctive and have only recently begun to merge. We find numerous deficiencies in this argument. Whether or not Willson v. Graphol Prod. Co., 188 F.2d 498, 505, 38 CCPA 1030 (1951), goes too far in attributing to an earlier registrant constructive notice of a subsequent infringing registration, see Callmann, Constructive Notice and Laches, 42 T.M.Rep. 395 (1952), the plaintiffs here had constructive notice of defendant's registration when they resumed post-war sales, and in its search incident to its application for registration in November, 1954, Chandon had ample opportunity to discover the prior existence of the San Marino registration, which had been cancelled only two months earlier. Furthermore, advertisements and the official minimum resale prices of Pierre Perignon were published in trade journals at least as early as 1948, and the parties stipulated that both Pierre Perignon and Dom Pérignon were so listed in 1955, 1956 and 1957. Although the defense of laches generally includes proof of actual knowledge by the party claimed to be barred, as in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2 Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), this is not an inflexible rule; a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered. C. B. Fleet Co. v. Mobile Drug Co., 284 F. 813 (5 Cir.1922).

 We find no such justification in the fact that intending purchasers of Dom Pérignon were not buying Pierre Perignon instead; they still are not, and the interests for which plaintiffs are here seeking protection are the same as they have always been. A quite different case would be presented if defendant now sought to market under the name "Pierre Perignon" a high quality champagne under arrangements with a French producer; then, indeed, plaintiffs' failure to move against the old and less damaging use would not bar protection against a new and more damaging one. Cf. Polaroid Corp. v. Polarad Electronics Corp., supra, 287 F.2d at 498. Furthermore, to the same extent that plaintiffs' unconsciousness of defendant's use of Pierre Perignon mitigates laches, it also lessens the force of the claim of injury. When the alleged infringer "is selling goods which the owner has never sold, though they are like enough to make people think him their source," the rights of the trade-mark owner "must be asserted early * * *" Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822, 824–825 (2 Cir.1943). This is not only to prevent the owner's "reaping a harvest which others have sown," *ibid.*, a factor not present here, but because the owner's delay in asserting his rights may lead the defendant to build up innocently an important reliance on the publicity of his mark, so that its loss would cost dearly. Thus, where the basis of relief is not an actual diversion of custom from the owner to the defendant, but only "the possibility that the trade practices of the second user may stain the owner's

**536**

reputation in the minds of his customers," or that the owner may later wish to enter the neighboring field now occupied by the second user, it is laid down for us in S. C. Johnson & Son v. Johnson, supra, 175 F.2d at 180, that we should not read 15 U.S.C. § 1114(1), with a wooden literalness, as requiring a result contrary to the previously established law. Although this court was the leader in granting relief to a trade-mark owner when there had been and was no likelihood of actual diversion, Aunt Jemima Mills Co. v. Rigney & Co., 247 F. 407 (2 Cir.1917), cert. denied, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918), we have likewise emphasized that, in such cases, "against these legitimate interests of the senior user are to be weighed the legitimate interests of the innocent second user" and that we must balance "the *conflicting interests* both parties have in the unimpaired continuation of their trade mark use." Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 613 (2 Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960). In the Polaroid case, supra, 287 F.2d at 495, we essayed a partial listing of factors requiring consideration in this weighing process; in Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp., 308 F.2d 196, 198 (2 Cir.1962)—a case in some ways the converse of this one since the older American user of a mark was seeking to prevent the use of a similar name long employed by a European firm—Judge Hincks ventured the prediction that "the full Bench of the court would now accept the propositions set forth [in Polaroid] * * *." Although some of the factors there listed—the degree of similarity between the two marks, the proximity of the products, and difference in quality— here favor the plaintiffs, others weigh for the defendant. Among these are the "weakness" of the mark, which is not at all one of those "fabricated marks which have no significance, save as they denote a single source or origin of the goods to which they are attached," S. C. Johnson & Son v. Johnson, supra, 175 F.2d at 180, but rather an appropriate choice for

any champagne because of its historical or mythological reference to the invention of that wine; see Durable Toy & Novelty Corp. v. J. Chein & Co., 133 F.2d 853 (2 Cir.), cert. denied, 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849 (1943) [Uncle Sam]; the improbability that plaintiffs would ever wish to produce American champagne; the defendant's good faith in adopting its mark; and the sophistication of the buyers. When we add three other factors—the rather sterile nature of plaintiffs' three-year priority due to their exceedingly limited sales in this country, their long delay in asserting their claim, and the serious harm an injunction would cause the defendant as against the trifling benefit to the plaintiffs—we have no doubt which way the scales fall.

We affirm the judgment dismissing the complaint.