GROTRIAN, HELFFERICH, SCHULZ, TH. STEINWEG NACHF., a corporation, Plaintiff,

v.

STEINWAY & SONS, a corporation, Defendant.

No. 69 Civ. 3320–LFM.

United States District Court, S. D. New York.

Oct. 1, 1973.

See also D.C., 54 F.R.D. 288.

Von Maltitz, Derenberg, Kunin & Janssen, New York City, and Hume, Clement, Hume & Lee, Chicago, Ill., for plaintiff; V. T. Giordano, New York City, Dean A. Olds, and Richard H. Compere, Chicago, Ill., of counsel.

Morgan, Finnegan, Durham & Pine, New York City, for defendant; Granville M. Pine, Harry C. Marcus and Kurt E. Richter, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

This is an action for declaratory judgment, injunctive relief and damages by Grotrian, Helfferich, Schulz, Th. Steinweg Nachf., a German corporation engaged in the manufacture and sale of pianos, against Steinway & Sons, a New York corporation engaged in the same business. The action was tried by the court without a jury.

Plaintiff seeks a declaratory judgment that its trade name, Grotrian-Steinweg, and corporate name, Grotrian, Helfferich, Schulz, Th. Steinweg Nachf., do not conflict with, nor infringe, defendant's trademarks, Steinway & Sons and Steinway; that the use of plaintiff's marks or names in the United States does not constitute unfair competition; that defendant is barred by laches from asserting any claim of conflict between the respective marks or names; and that plaintiff has the right to use its trade or corporate name free from interference by defendant. Plaintiff also seeks to enjoin defendant from interfering with the use of plaintiff's mark or name by plaintiff or its licensees and from instituting suit anywhere challenging the right of plaintiff or its licensees to use plaintiff's mark or name. Finally, plaintiff seeks damages for defendant's alleged tortious interference with a prospective contract between plaintiff and The Wurlitzer Company ("Wurlitzer") for the sale and distribution of plaintiff's pianos through a chain of retail stores in the United States.

Defendant's answer generally denies the significant allegations of the complaint and counterclaims under the Lanham Act, 15 U.S.C. § 1051 et seq., for injunctive relief, an accounting and damages for wilful infringement of its trademark and unfair competition. Plaintiff's reply denies the significant allegations of the counterclaim and alleges affirmative defenses of laches and unclean hands.

Before discussing the issues, it is necessary to review the historical relationship between the parties.

Defendant Steinway & Sons, manufacturer and seller of renowned Steinway pianos, was founded in 1853 by Heinrich E. Steinweg, who emigrated to the United States from Germany in 1850. Heinrich's eldest son, C. F. Theodor Steinweg, remained in Germany and began to make pianos in 1851 under the firm name C. F. Theodor Steinweg, which was registered in Germany. Later, he sold his business to his three employees, F. W. Grotrian, Adolph Helfferich and H. G. W. Schulz, moved to New York and joined the defendant as a partner on January 1, 1866. C. F. Theodor Steinweg granted the German buyers the privilege of continuing the business under the firm name "Successors to C. F.

Theodor Steinweg" for ten years, but because of confusion with defendant the name was changed by agreement to "Grotrian, Helfferich, Schulz, Successors to Th. Steinweg."

Later, however, plaintiff first registered the trademark Grotrian-Steinweg in Germany and then, in 1895, registered the name Steinweg. Plaintiff's use of the latter name caused defendant to bring an action in Germany resulting in the cancellation of the registration. Nevertheless, in December 1918, shortly after the armistice, the Grotrian family, plaintiff's owners, petitioned for an official change of the family name to "Steinweg or at least Grotrian-Steinweg," despite the fact that the Grotrians were never related by blood or marriage to anyone in a Steinway or Steinweg family. The petition admitted that "the focal point of our firm is on the name Steinweg. The word 'Grotrian' is unpronounceable for an Englishman. . . . [A] shortening of the long business name would be an extraordinary blessing and benefit . . . especially for the export of the product." The petition was granted to the extent that the Grotrian family was permitted to change its name to "Grotrian-Steinweg."

There is no evidence that plaintiff ever spent any money or made any effort before 1925 to publicize, promote or sell its product outside Germany under the mark Grotrian-Steinweg, but since it acquired that name plaintiff's owners have often been called "Steinweg" and have been asked whether there is any connection between plaintiff and the defendant. Similarly, plaintiff's piano has often been identified as a "Steinweg."

Plaintiff first tried to enter the American market in 1925 when it established a Delaware corporation named "Grotrian-Steinweg Company" for the purpose of distributing pianos bearing the mark Grotrian-Steinweg which it registered in the United States. In 1926, plaintiff exported four pianos to the United States; in 1927 nine; and in 1928 twelve. During this period, plain-

tiff also sold pianos in the American market through a New York dealer named S. L. Curtis. When defendant learned, in 1928, that plaintiff was selling pianos in the United States, it immediately notified both the Delaware distributor and the New York dealer of defendant's rights to the trade names Steinway and Steinway & Sons, vigorously protested that the mark Grotrian-Steinweg infringed defendant's trade names, predicted that it was "bound to be a source of confusion with the trademark and trade name Steinway," and demanded that the distributor discontinue the use of the words "Grotrian-Steinweg" on pianos in the United States. Unimpressed, plaintiff's shipments mounted to forty-seven in 1929.

Confronted with an impasse, William Steinway, an officer of the defendant, decided to talk face to face with plaintiff about the trade name dispute. He therefore went to Germany in 1929, discussed the dispute and negotiated a settlement, signified by smoking a cigar with plaintiff's then principal owner.

There was no proof of the express terms of the settlement. Plaintiff contends that the "peace cigar" evidenced defendant's surrender to plaintiff's use of the trade name Grotrian-Steinweg in the United States. The ensuing conduct of the parties, however, points to the opposite inference, viz., that plaintiff agreed to cease using the names Steinweg and Grotrian-Steinweg in the United States. Thus, the distributing company was disbanded in 1930; the dealer, Curtis, stopped selling plaintiff's pianos; plaintiff's exports to the United States dwindled to four pianos by 1932; and not one Grotrian-Steinweg piano came into this country for the next twenty years. In 1950, plaintiff even abandoned its unused 1926 United States trademark registration which never had been published for opposition.

The inference is clear that the cordial relations which existed between the parties during the twenty-year period were attributable not to defendant's surrender of its rights but to a tacit, if not an ex-

press, understanding that plaintiff would cease using the names Steinweg and Grotrian-Steinweg in the United States.

However, in 1952, plaintiff quietly reentered the American market on a mail order basis and for the next twenty years regularly shipped a relatively insignificant number of pianos to small dealers who sold only in their own localities. During the next twenty years, plaintiff shipped a total of only 458 pianos, having an aggregate retail value exceeding $1,890,000, the shipments ranging from a low of four in 1954 to a peak of forty-eight in 1970. However, plaintiff itself never made or sold any pianos in the United States, never employed an advertising agency nor a public relations firm, nor did it require any advertising by its United States dealers, although, as we shall see, it did supply them with promotional material. No representative of the plaintiff ever came here for the thirty-seven year period from 1929 until 1966. Moreover, plaintiff never had a resident agent in the United States for service of process.

Commencing in August 1966, by an exchange of letters ending in January 1967, plaintiff entered into an agreement with Wurlitzer for the distribution and sale of plaintiff's pianos in Wurlitzer's chain of thirty-one retail music stores located in prime metropolitan markets throughout the United States, The agreement was not for any definite period of time, and, although plaintiff urged Wurlitzer to buy at least 200 pianos, Wurlitzer refused to agree to any definite number but did agree to use its best efforts to promote the sale of plaintiff's pianos throughout its chain of stores. Wurlitzer assured plaintiff that no time would be wasted in getting underway with an aggressive sales program and, upon plaintiff's insistence, agreed to describe plaintiff's piano as the "Grotrian-Steinweg."

Accordingly, in July 1967, Wurlitzer issued a press release announcing that the world-famous Grotrian-Steinweg piano would be sold in Wurlitzer's retail stores. The release proclaimed that Grotrian-Steinweg was an internationally renowned grand piano available up to the nine-foot concert size, that it was the most cultivated piano in the world, that it represented the most perfect product of the art of piano making, and that Grotrian-Steinweg, founded in 1835, was long known as the manufacturer of the classic grand piano which was the most famous piano in Germany and which was endorsed by eminent piano artists throughout the world. When the announcement came to defendant's attention, it promptly warned Wurlitzer that Steinway & Sons considered the mark Grotrian-Steinweg an infringement of its trademarks Steinway and Steinway & Sons, "long registered with the U.S. Patent Office" and "would take prompt legal action to prevent the advertising and sale of this piano" under the name Grotrian-Steinweg in this country.

Thereafter, Wurlitzer's president met with the plaintiff's president and his brother to discuss the problem which confronted them. Plaintiff apparently suggested that one solution would be for Wurlitzer to sell plaintiff's piano without using the Grotrian-Steinweg name. Wurlitzer's reply to the suggestion is convincing evidence that one of this country's largest dealers in musical instruments knew that plaintiff's piano would have little acceptance on the American market without exploitation of the Steinway name and good will:

> "I have discussed with our people responsible for the sale of our pianos in our retail stores the acceptability and salability of pianos manufactured by you but not bearing the Grotrian-Steinweg name on the fallboard. In their opinion, without the prestige and background of the name, it would be virtually impossible to compete because of the price structure." PX 27.

Thereafter, Wurlitzer's officers, accompanied by counsel, met with defendant, and Wurlitzer, upon advice of counsel that there was no solution to the problem, cancelled its contract with

plaintiff on November 21, 1967 after having purchased only 24 of plaintiff's pianos during the year of the relationship.

Since all of the issues depend on the merits of defendant's counterclaim for trademark infringement and unfair competition, we first consider the counterclaim.

## INFRINGEMENT

The Lanham Act, 15 U.S.C. § 1114(1), provides a remedy for trademark infringement against "[a]ny person who shall, without the consent of the registrant—(a) use in commerce any reproduction . . . or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods . . . on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. . . ."

Before the amendment to § 1114(1) in 1962, both the Act and the cases applying it required confusion of "purchasers as to the source or origin of such goods or services."[1] The amendment, however, eliminated the qualifying language respecting confusion as to source, "thereby evincing a clear [congressional] purpose to outlaw the use of trademarks which are likely to cause confusion, mistake or deception *of any kind*, not merely of purchasers nor simply as to source or origin."[2]

■ Thus, the essential question to be answered is whether, under all of the circumstances, the mark Grotrian-Steinweg on the piano is similar enough to Steinway or to Steinway & Sons that its use is likely to cause confusion, mistake or deception *of any kind*.[3]

■ In determining the existence of a likelihood of confusion, a number of factors must be considered. Among these are: the strength of the Steinway marks; the alleged infringer's purpose in adopting its marks; the degree of similarity between the marks; the degree of similarity between the products; the competitive proximity of the products; actual confusion; and the degree of care likely to be exercised by consumers.[4] That approach, we think, is still useful in our analysis, although, obviously, confusion of buyers as to source or origin, although material, is no longer essential.

The relevant factors are variable. No single factor is determinative, and the court may take still other variables into account.[5] We must, therefore, weigh the evidence relative to each factor along with other applicable factors, such as, the prior owner's alleged delay in asserting its claim. Finally, we must balance the equities between the parties.[6]

We turn, now, to consideration of the relevant factors.

## THE STRENGTH OF THE STEINWAY MARKS.

There is no dispute that defendant has been continuously making and selling pianos throughout the United States

1. Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 411 F.2d 1097 (2d Cir. 1969); Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 612 (2d Cir. 1960); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2d Cir. 1956); Dwinell-Wright Co. v. White House Milk Co., 132 F.2d 822, 824–825 (2d Cir. 1943).

2. Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 437 F.2d 566, 568 (2d Cir. 1971) (emphasis added).

3. Syntex Laboratories, Inc. v. Norwich Pharmacal Co., *supra*.

4. B & L Associates v. H. Daroff & Sons, Inc., 421 F.2d 352, 354 (2d Cir. 1970); Miss Universe, Inc. v. Patricelli, 408 F.2d 506, 509 (2d Cir. 1969); Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961).

5. Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., *supra*, 411 F.2d at 1099; Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp., 308 F.2d 196, 198 (2d Cir. 1962); Polaroid Corp. v. Polarad Electronics Corp., *supra*, 287 F.2d at 495; Restatement of Torts, §§ 729, 730 and 731 (1939).

6. Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531 (2d Cir. 1964).

for 123 years. The business was founded in Germany and the first instrument was made in 1835 by Heinrich E. Steinweg, the great grandfather of defendant's president, Henry Z. Steinway. The great grandfather emigrated to New York City in 1850, Anglicized his name to Henry E. Steinway, and started the defendant firm of Steinway & Sons in 1853.

The trademarks Steinway and Steinway & Sons have long been registered, advertised, promoted and used exclusively to identify defendant's product. The names have been affixed to defendant's pianos in a variety of styles, types and forms, and defendant's registered slogan, "Steinway, The Instrument of Immortals," has been continuously used for fifty years.

There is no dispute that a Steinway piano is an instrument of distinctive quality and that defendant has earned and long enjoyed immense good will. Defendant has made a considerable investment to ensure public identification and recognition of the mark. The name "Steinway" differentiates defendant's piano from all others, not only to professional pianists, concert artists and music recording companies, but also to amateur musicians, students, prospective buyers and the public. There can be little doubt that upon hearing the name "Steinway," anyone the least familiar with music would instantly think not so much of the identity of the producer as of the piano itself. Indeed, the name "Steinway" is so associated in the minds of prospective buyers and the public with defendant and its product that plaintiff's own dealers were of the opinion that "Steinway competition is tough, since the name STEINWAY has a magic influence on buyers," has an "attrac-

tion" or "excitement," and that "people seem to be swayed by this name."[7] As we have noted earlier, Wurlitzer was unmistakably sure of the strength of the mark.

Confronted with irrefutable facts, plaintiff understandably concedes that it is "perfectly obvious" that "Steinway is a famous name." "We don't contest that for a second." [8]

■ Likewise, it is plain to us that there is a strong link between the names Steinway and Steinway & Sons and defendant producer and its piano. Defendant's mark is thus strong and its name famous. As such, it is entitled to broader protection than a suggestive, weak or commonplace mark.[9]

The registration of defendant's mark entitled it to the full scope of statutory protection afforded trademarks, including the provision of § 7(b) of the Lanham Act, 15 U.S.C. § 1057(b), that a "certificate of registration . . . shall be prima facie evidence of the validity of the registration . . . and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate . . . ."[10]

We next consider plaintiff's purpose in adopting its mark.

## PLAINTIFF'S PURPOSE IN ADOPTING ITS MARK.

■ There is no evidence that plaintiff ever expended any money or made any effort whatever before the filing of the German petition to change the family name to publicize, promote or sell its product outside Germany under the mark Grotrian-Steinweg or Grotrian. Neither of those names, as the then petitioners pleaded, meant anything in Eng-

---

7. Defendant's Exhibits ("DX ——") GD, GF; plaintiff's post-trial brief, p. 4.

8. Trial transcript ("Tr. ——), p. 209.

9. *See, e.g.,* Communications Satellite Corp. v. Comcet, Inc., 429 F.2d 1245 (4th Cir.), cert. denied, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed. 2d 245 (1970) ; Arrow Distilleries, Inc. v.

Globe Brewing Co., 117 F.2d 347, 351 (4th Cir. 1941) ; France Milling Co. v. Washburn-Crosby Co., 7 F.2d 304 (2d Cir.), cert. denied, 268 U.S. 706, 45 S.Ct. 640, 69 L.Ed. 1168 (1925).

10. Miss Universe, Inc. v. Patricelli, *supra,* 408 F.2d at 509.

lish-speaking countries. The ancestral Grotrians candidly adopted the name Steinweg for the sole purpose of exploiting the Steinweg name in exporting pianos to English-speaking countries. Moreover, they did this despite knowledge of defendant's trademark and its objections. The conclusion, we think, is inescapable that plaintiff's owners adopted the name Steinweg as the dominant portion of plaintiff's trademark for the conscious and, indeed, the avowed purpose of exploiting and trading on the good will and reputation of defendant. It would be difficult to conceive of a more deliberate intent of an infringer to imitate and palm off his products as those of another.[11] This longstanding intention, as we shall see, is further borne out by plaintiff's later activities in the United States. Such conscious imitation, in itself, is strong evidence of the likelihood of confusion.[12]

This brings us to consideration of the degree of similarity between the products.

## THE DEGREE OF SIMILARITY BETWEEN AND THE COMPETITIVE PROXIMITY OF THE PRODUCTS.

■ Both parties manufacture lines of upright and grand pianos,[13] and both pianos are considered "the very finest and expensive pianos that cater and administer to artists and the professions."[14] Thus, the products are virtually identical and compete on a direct basis. Competitive proximity is also shown by the parties' (1) common prospective purchasers, (2) parallel channels of marketing and (3) common purposes and use.[15]

■ This high degree of competitive proximity is demonstrated by evidence that individual Grotrian-Steinweg dealers exploited the confusing similarity between the products to induce sales. For example, one Grotrian-Steinweg dealer advertised: "If you are in the market for a new Steinway, consider a new Grotrian-Steinweg."[16] There is testimony that Grotrian-Steinweg's sold for 10% or 15% less than comparable Steinways, but both are in an equally expensive price range—$5,000 to $13,000 as against $300 to $1,000 for most other pianos.[17]

We now turn to the similarity between the marks.

## THE DEGREE OF SIMILARITY BETWEEN THE MARKS.

■ Where products are virtually identical, as is the case here, the degree of similarity in trademarks necessary to support a finding of infringement is less than in a case of dissimilar, non-competing products.[18]

■ The 1962 amendment to the Lanham Act, broadening the kind of trademark confusion prohibited, recognized the commercial reality that in our modern marketing structure goods are sold and offered for sale not so much on the identity of the producer as on the buyer's assurance from the mark that he is buying the genuine product and not an imitation. This allows the consumer to make an informed choice simply by reliance upon the mark, whether or not he

11. Miles Shoes, Inc. v. R. H. Macy & Co., 199 F.2d 602, 603 (2d Cir. 1952).

12. Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609 (7th Cir. 1965) ; Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 760 (2d Cir. 1960) ; Chester Barrie, Ltd. v. The Chester Laurie, Ltd., 189 F.Supp. 98 (S.D.N.Y.1960).

13. Tr. 201–02.

14. Comsky deposition, pp. 5 and 7.

15. Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F.Supp. 4, 13 (E.D.N.Y. 1969) ; Restatement of Torts § 731 (1939).

16. DX CP.

17. Tr. 133.

18. Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., *supra.*

identifies it with any manufacturer.[19] The likelihood of confusion between products, therefore, becomes highly significant.[20] Because of this, the test for infringement is not identity but confusing similarity. Colorable imitations are prohibited on the face of the statute. The general, overall impression given by the marks is the decisive criteria.[21] The issue, therefore, is not whether plaintiff's and defendant's pianos can be told apart, or even whether they usually would be, but whether there is a likelihood that because of the similarity of names affixed to them they might not be differentiated.[22]

██ The buying public, as Wurlitzer implied, would clearly differentiate the name "Grotrian," but just as surely it would not be likely to differentiate the name "Grotrian-Steinweg." It was thus the Steinway name which stirred Wurlitzer's commercial instincts, not the unknown and unpronounceable "Grotrian." In any event, the junior user cannot avoid infringement of a valid trademark simply by taking the mark and adding his own name to it.[23]

██ Thus, infringement may exist where the substantial and distinctive part of the trademark is copied or imitated.[24] Similarity of sound, as well as appearance of words or letters, may constitute infringement.[25]

Plaintiff's owners have often been called "Mr. Steinweg" and have been asked whether there is any connection between the plaintiff and the defendant.

Similarly, plaintiff's piano has often been identified as a "Steinway."

It is implicit in plaintiff's petition to change the family name "Grotrian" to "Grotrian-Steinweg" that the name "Steinweg," unlike "Grotrian," could be easily pronounced in the English language. There is an obvious visual and audible similarity between "Steinway" and "Steinweg," which is enhanced when the German "veg" is translated to the English "way." The probability of audible identity of the marks is virtually assured by plaintiff's instructions to its dealers.

The similarity is no less with the name "Grotrian-Steinweg," especially in the United States, where double surnames are uncommon, and the conclusion that "Grotrian" is simply the first name and "Steinweg" the last is perfectly natural. It is plain that plaintiff and Wurlitzer were certain of such confusion. It was the Steinway name that had the prestige and background which Wurlitzer wanted to exploit. After all, defendant had spent more than $20,000,000 over a period of seventy-five years in promoting and advertising the Steinway name in the United States. Against this, plaintiff had never spent a penny on promotion or advertising its name in the United States.[26]

## ACTUAL CONFUSION.

[13] Although evidence of actual confusion is not essential to a finding of trademark infringement,[27] there can be

19. See Developments in the Law, Trademarks and Unfair Competition, 68 Harv.L. Rev. 814, at 817 (1955).

20. See Syntex Laboratories, Inc. v. Norwich Pharmacal Co., supra.

21. I.T.S. Industria Tessuti Speciali v. Aerfab Corp., 280 F.Supp. 581 (S.D.N.Y.1967).

22. Syntex Laboratories, Inc. v. Norwich Pharmacal Co., supra, 315 F.Supp. 45, 52 (S.D.N.Y.1970).

23. Electronic Communications, Inc. v. Electronic Components for Industry Co., 443 F. 2d 487 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 80, 30 L.Ed.2d 63 (1971); Mr.

Travel, Inc. v. V.I.P. Travel Service, Inc., 268 F.Supp. 958 (N.D.Ill.1966), aff'd, 385 F.2d 420 (7th Cir. 1967).

24. David Sherman Corp. v. Heublein, Inc., 340 (8th Cir. 1965).

25. David Sherman Corp. v. Heublein, Inc., supra.

26. Tr. 106.

27. "It is at most an evidentiary factor of some weight for inclusion in the balance ultimately to be struck." W. E. Bassett Co. v. Revlon, Inc., 305 F.Supp. 581, 587 (S.D. N.Y.1969); Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., supra, 281 F.2d at 761.

no more positive proof of likelihood of confusion than evidence of actual confusion.[28] There is ample evidence in this case of actual confusion between defendant's and plaintiff's marks.

One example of actual confusion occurred when a Grotrian-Steinweg dealer, who advertised his product as "a Grotrian-Steinway,"[29] told a Steinway dealer that the Grotrian-Steinweg was a German Steinway. The *Syntex* case's "confusion of any type" test[30] surely extends to include this kind of confusion. An actual purchaser may know that a Grotrian-Steinweg was not made by defendant but nevertheless be misled by the mark Grotrian-Steinweg to believe that there is a significant connection or relationship between the plaintiff and the defendant. This mental association resulting from the observation of the mark would have the effect of bestowing upon Grotrian-Steinweg pianos the good will developed by Steinway & Sons. The fact that the true identity of the Grotrian-Steinweg might be recognized by an actual purchaser is of little moment. The significance of the dealer's misconception is its role as a harbinger of confusion.[31]

 Stronger evidence of actual confusion is revealed in the first of two surveys commissioned by Steinway.[32] This first survey, the Rittenhouse Survey, consisted of a series of 23 tape-recorded personal interviews with recent purchasers of Grotrian-Steinweg pianos. None of the persons interviewed specifically concluded that Grotrian-Steinweg pianos were made by defendant, but deception of, and confusion, in the public mind was clearly demonstrated.[33]

The specific objectives of the second survey, conducted by Crosley Surveys, Inc., was to determine the existence and estimate the magnitude of confusion between Steinway and Grotrian-Steinweg as to business connection and name.[34] The conclusion drawn from a sample of 520 people canvassed was that 7.7% of them preceived a business connection between the two companies and 8.5% confused the names.

The surveys are strong evidence of the likelihood of confusion which the Lanham Act was designed to prohibit.

## DEGREE OF CARE LIKELY TO BE EXERCISED BY CONSUMERS.

The ordinary consumer of a Steinway or Grotrian-Steinweg piano is profiled in the record. He plays the piano well,[35] is often a professional,[36] and more than half the time he will bring an

28. Spangler Candy Co. v. Crystal Pure Candy Co., 353 F.2d 641, 644 (7th Cir. 1965).

29. DX GJ.

30. See n.2, *supra*.

31. Communications Satellite Corp. v. Comcet, Inc., *supra*, 429 F.2d at 1251.

32. Having reserved, over hearsay objections, on the admissibility of surveys at trial, we now find them admissible because there is a "need for the statement at trial and the circumstantial guaranty of trustworthiness surrounding the making of the statement" is present. Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 683 (S.D.N.Y.1963). There is a clear necessity for this survey evidence simply because evidence of actual confusion is always almost impossible to find. *Id.* The circumstances under which the out-of-court statements were made satisfies us of the surveys' trustworthiness. Completely impartial individuals were questioned, and they had no motive to falsify their responses. The surveys were conducted by recognized experts and the data accurately recorded. The relevant requirements of admissibility for samples and polls are fully met here. Protracted Cases—Recommended Procedures, 25 F.R.D. 351, 425 –430 (1960). Our finding in favor of admissibility under *Zippo's* need for the evidence doctrine precludes plaintiff's claim that the Rittenhouse survey for the most part elicited the respondent's present attitude thus making the results inadmissible under the state of mind exception, as noted in Pope v. United States, 296 F.Supp. 17 (S.D.Cal.1968).

33. Exemplitive responses were: "it's a Steinway made in Germany" (Tr.164); "the Steinway Company in Germany" (Tr.165); "the parent company to Steinway" (Tr. 166); "Steinway was an offshoot;" "from the history . . . gather it's a Steinway" (Tr. 165); and "the original Steinway, the German Steinway" (Tr. 164).

34. DX GL.

35. Tr. 214.

36. Tr. 214.

expert to assist in his selection if he feels that he is not qualified to make a final judgment.[37] Underpinning this deliberate attitude is, of course, the price range involved—$5,000 to $13,000.

Plaintiff argues that purchaser will not be confused because of the degree of their sophistication and the price.[38] It is true that deliberate buyers of expensive pianos are not as vulnerable to confusion as to products as hasty buyers of inexpensive merchandise at a newsstand or drug store.[39] The sophistication of buyers, however, does not always assure the absence of confusion.[40] It is the subliminal confusion apparent in the record as to the relationship, past and present, between the corporate entities and the products that can transcend the competence of even the most sophisticated consumer.

Misled into an initial interest, a potential Steinway buyer may satisfy himself that the less expensive Grotrian-Steinweg is at least as good, if not better, than a Steinway. Deception and confusion thus work to appropriate defendant's good will. This confusion, or mistaken beliefs as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company.[41] Thus, the mere fact that purchasers may be sophisticated or discriminating is not sufficient to preclude the likelihood of confusion. " 'Being skilled in their own art does not necessarily preclude their mistaking one trademark for another when the marks are as similar as those here in issue, and cover merchandise in the same general field.' "[42] Even a discriminating purchaser might well assume that the marks in issue were trademarks on companion products of a single producer.[43]

## LACHES

Plaintiff asserts the defenses of laches and estoppel alleging Steinway's ten-year silence after discovery of sales by plaintiff in the United States.

The mere lapse of time is not sufficient to constitute laches. The delay must have been unreasonable and have resulted in prejudice to the plaintiff. The crucial issue on the first element, unreasonable delay, is the question of knowledge; did defendant *knowingly* sleep on his rights?[44]

Plaintiff commenced sales activity in the United States in 1926, but defendant did not learn of plaintiff's sales until 1928 when it immediately protested and warned of infringement of its trademark. No Grotrian-Steinwegs were sold in the United States for twenty years thereafter, and there was no need for the defendant to assert its rights during that period, believing that Grotrian-Steinweg had agreed to avoid the United States market, in the "peace cigar" incident.

Grotrian-Steinweg entered the American market again in 1952. The date Steinway learned of this second entry is disputed. Although Henry Z. Steinway (president of Steinway & Sons) testified that he was uncertain as to exactly when he first heard of Grotrian-Steinweg sales in the United States, he believed it was not before the middle 1960s that he learned of two Grotrian-Steinweg dealers operating on the west coast.[45] Plaintiff claims defendant's

37. Comsky deposition, pp. 11 and 13.

38. B & L Sales Associates v. H. Daroff & Sons, Inc., *supra*, 421 F.2d at 354.

39. Callmann, Unfair Competition-Trademarks and Monopolies (3d ed. 1971).

40. Communications Satellite Corp. v. Comcet, Inc., *supra*, 429 F.2d at 1252.

41. American Drill Bushing Co. v. Rockwell Mfg. Co., 342 F.2d 1019, 1022, 52 CCPA 1173 (1965).

42. *Id.*

43. Application of Dobeckmun Co., 286 F.2d 187, 188, 48 CCPA 810 (1960).

44. Chandon Champagne Corp. v. San Marino Wine Corp., *supra*, 335 F.2d at 535; Ritter v. Rohm & Haas Co., 271 F.Supp. 313, 347 (S.D.N.Y.1967).

45. Tr. 198.

knowledge extends from at least 1957. The clearest evidence to support this assertion consists of a letter from Steinway & Sons' London office to Theodore D. Steinway, then director of engineering:[46]

> "Two American citizens called here making enquiries concerning the Steinway piano, one from Missouri and one from California. Both of them stated in unqualified terms that the Grotrian-Steinweg was now being marketed in the U.S.A., and that the salesman had informed them it was the original Steinway.
>
> I would like to suggest that you make enquiries by underground methods to get to the truth of this matter. It is a similar instance to that we had here in London years ago, and the sooner it is squashed the better."[47]

This letter would appear to have given defendant notice of Grotrian-Steinweg's participation in the American market. One would expect Steinway & Sons to investigate the leads contained in this letter, especially as the Grotrian-Steinweg was being misrepresented as the "original Steinway." Henry Steinway testified that after receiving this letter, he reviewed the total German import figures but due to the small number took no action.[48]

Plaintiff also calls attention to a July 3, 1957 letter from Steinway & Sons to Grotrian-Steinweg which read in part:

> "We shall transmit your letter also to Mr. William Steinway in New York. Over there, there seems to be at the present moment again a small dispute on account of a printing error in the advertisement of one of your agents;

however, if need be, we will settle this very promptly."[49]

The subject of the "dispute" referred to in this passage is unclear, but the letter may indicate knowledge by Steinway that plaintiff had selling agents in the United States.

 Between 1952 and 1968, Grotrian-Steinweg sold 320 pianos in the United States with a retail value of over $1,323,000. The volume of plaintiff's sales is important because though actual knowledge is usually required to prove laches, a defendant may be barred when the plaintiff's conduct has been open and no adequate justification for ignorance is offered.[50]

Plaintiff's activities were always open, as evidenced by numerous playbill and yellow page advertisements,[51] and defendant has offered no excuses for its ignorance of Grotrian's United States sales.

While the evidence on delay appears to weigh in plaintiff's favor, we find it unnecessary to decide this issue since the second element of laches, prejudice, is not present. The burden is on plaintiff to show prejudice suffered due to Steinway's delay in suing. Mere delay is not sufficient to constitute laches.[52]

Commonly cited criteria of prejudice are the expenditure of significant amounts for the advertising and promotion of the mark or a general business expansion as a result of the increased demand for the product being sold under the mark in question. For example, in Landers, Frary & Clark v. Universal Cooler Corp., 85 F.2d 46 (2d Cir. 1936), the defendant had invested $140,000 in advertising and its capital investment

---

46. Henry Steinway acknowledged that he "undoubtedly received" a copy of this letter. Tr. 223.

47. Plaintiff's Exhibit ("PX ——") 57.

48. Tr. 222–23.

49. PX 36.

50. Chandon Champagne Corp. v. San Marino Wine Corp., supra, 335 F.2d at 535; C. B.

Fleet Co. v. Mobile Drug Co., 284 F. 813 (5th Cir. 1922).

51. DX GF and GJ.

52. Tisch Hotels, Inc. v. Americana Inn, Inc., supra, 350 F.2d at 615; Akers v. State Marine Lines, Inc., 344 F.2d 217, 220 (5th Cir. 1965); Ritter v. Rohm & Haas Co., supra; United States v. Manufacturers Hanover Trust Co., 229 F.Supp. 544, 546 (S.D.N.Y. 1964).

had increased from $500,000 to $900,000 over an eight-year period in which the senior user remained silent; the defendant spent these large sums as it was increasing its business in reliance upon its apparent immunity. Judge Learned Hand added:

"Moreover, the estoppel need not depend upon expenditure alone. When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use; the whole selling organization must be recast and the market re-educated; nobody can estimate what the losses may be." *Id.* at 49.

Plaintiff Grotrian-Steinweg has expended nothing on advertising or promotion in the American market. Nor has it expanded its production or distribution facilities. At the time of suit, its production capacity was less than it had been in 1927. A planned expansion in response to the Wurlitzer agreement never came about due to a depression in 1967.[53] Plaintiff's American sales were always limited to a few dealers in limited geographical areas.[54] Nor is there any evidence that plaintiff will be required to reorganize its business or reeducate the public as to its product if restrained from using the mark "Steinweg." Public awareness of plaintiff's mark is minimal.[55] Whatever market awareness exists for plaintiff's product can be maintained by use of the mark "Grotrian."

In short, plaintiff has not relied on its mark,[56] or suffered any prejudice from Steinway's alleged delay in asserting its rights.[57]

Plaintiff's laches defense is further weakened by its conscious imitation and attempted exploitation of Steinway's mark.[58] A knowing, intentional infringer's standing to assert the equitable defense of laches is questionable. "[A]dvantages built upon a deliberately plagiarized make-up do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed."[59]

Plaintiff having failed to prove prejudice, an essential element of the laches defense, it must follow that defendant's counterclaim is not barred by laches.

We observe briefly at this juncture that the adjudications on the matter of the marks in question that may have been made in a foreign court have no application here. "[W]hen trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible."[60] Thus, we do not consider the reputed German court decisions of 1926 offered by plaintiff.[61]

We now turn to the collective significance of the various factors on infringement.

The first factor in importance and chronology in balancing the various factors and equities relevant to the question of infringement is Grotrian-Steinweg's deliberate purpose in adopting and using the disputed mark in the United States.

53. Tr. 110–111.

54. Tr. 23; DX GF, at p. 13.

55. DX GF, at pp. 68–69.

56. Chandon Champagne Corp. v. San Marino Wine Corp., *supra*, 335 F.2d at 535.

57. *Cf.* Foster v. Magnetic Heating Corp., 297 F.Supp. 512, 519 (S.D.N.Y.1968), aff'd per curiam, 410 F.2d 12 (2d Cir.), cert. denied, 396 U.S. 829, 90 S.Ct. 82, 24 L.Ed.2d 80 (1969).

58. See discussion on pp. 16–17.

59. Miles Shoes, Inc. v. R. H. Macy & Co., *supra*; Landers, Frary & Clark v. Universal Cooler Corp., 85 F.2d 46 (2d Cir. 1936); MY-T Fine Corp. v. Samuels, 69 F.2d 76, 78 (2d Cir. 1934).

60. Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633, 639 (2d Cir. 1956).

61. See, Baglin v. Cusenier Co., 221 U.S. 580, 595–596, 31 S.Ct. 669, 55 L.Ed. 863 (1911); George W. Luft Co. v. Zande Cosmetic Co., 142 F.2d 536 (2d Cir. 1944).

Plaintiff's own expert judgment and considered decision to use the name Grotrian-Steinweg in the sale of its pianos in the United States, despite Steinway's well-known objections, indicates that it believed there was some distinct and peculiar benefit to be derived therefrom. It was plaintiff's opinion that its name was close enough to that of defendant's for it to generate especial market enhancement more than any other available name (including "Grotrian" alone), and it therefore endeavored to sell Grotrian-Steinweg pianos here.

Plaintiff's course of conduct, indicative of its expert corporate judgment, is, in itself, powerful evidence of a substantial likelihood of confusion with Steinway's marks.[62] The degree of similarity ratified by plaintiff's informed decision to use the mark, in the context of this case, appears to equal that overall similarity proscribed by the Lanham Act.[63]

■ The other relevant factors, including the close competitive proximity and similarity of the products, the extensive similarity between the marks, the great strength of the Steinway mark, and the evidence of actual confusion all point to the likelihood of confusion. These considerations lead us to the conclusion that plaintiff is infringing defendant's trademarks Steinway and Steinway & Sons because the name Grotrian-Steinweg is likely to cause confusion, mistake or deception; defendant is, therefore entitled to the relief sought, and plaintiff's claims for declaratory and injunctive relief are denied.

## THE TORTIOUS INTERFERENCE WITH CONTRACT CLAIM.

■ Since we find that plaintiff has infringed Steinway & Sons' trademark, it follows that defendant's warning to Wurlitzer of possible legal action to protect its marks is not actionable as a tortious interference with contract. Defendant was entitled to insist, in good faith, on its legal rights, even if such insistence resulted in the cancellation of the Wurlitzer-Grotrian contract.[64] One may not be held liable in tort for "asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction."[65] Here, Steinway merely sought, in good faith,[66] to protect its mark which it believed plaintiff was infringing. Defendant may not be held liable for insisting on the rights guaranteed to it by the Lanham Act.

## UNFAIR COMPETITION.

Both parties have made claims alleging unfair competition.

■■ Trademark law must be distinguished from the law of unfair competition.[67] Trademark infringement is a subdivision of the broader law of unfair competition and similar principles apply in unfair competition and trademark law.[68]

There exists unfair competition where there is sufficient similarity between the products, their packaging, appearance, advertising, prices and methods of

62. W. E. Bassett Co. v. Revlon, Inc., *supra*, 305 F.Supp. at 588–89.

63. The fruit of this conscious imitation by plaintiff, strong evidence itself of possible confusion (King Research, Inc. v. Shulton, Inc., 454 F.2d 66 (2d Cir. 1972); Tisch Hotels, Inc. v. Americana Inn, Inc., *supra*; Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., *supra*; Sears, Roebuck & Co. v. Allstate Driving School, Inc., *supra*), was manifested in several instances of actual commercial attempts by plaintiff's dealers to exploit the similarity. DX CP, CR, GJ and GF.

64. Kaplan v. Helenhart Novelty Corp., 182 F.2d 311, 314 (2d Cir. 1950).

65. Restatement of Torts, § 773 (1939); Dinkins v. General Aniline & Film Corp., 214 F.Supp. 276, 280 (S.D.N.Y.1963).

66. Tr. 212–13, 218.

67. Field Enterprises Educational Corp. v. Cove Indus., Inc., 297 F.Supp. 989, 995 (E.D.N.Y.1969).

68. Fieldcrest Mills, Inc. v. Couri, 220 F.Supp. 929 (S.D.N.Y.1963).

distribution as to lead to the likelihood of misappropriation of good will or confusion among purchasers as to the product's source.[69] The law of unfair competition, therefore, protects more than a name:

> "The essential element of a trademark is the exclusive right of its owner to use a word or device to distinguish his product. On the other hand, a claim of unfair competition considers the total physical image given by the product and its name together."[70]

Since the basis of a finding of trademark infringement is confusion, such a finding necessarily also constitutes unfair competition.[71]

We find that the name Grotrian-Steinweg, as appearing upon plaintiff's pianos, is likely to lead to confusion among consumers as to the source of the pianos. Therefore, Grotrian-Steinweg is guilty of unfair competition by its sales of pianos marked "Grotrian-Steinweg" in the United States.

Accordingly, we declare the trade name Grotrian-Steinweg and the corporate name Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. as infringing defendant's trademarks Steinway and Steinway & Sons. We find that the use of plaintiff's names in the United States also constitutes unfair competition. Defendant is not barred by laches from asserting its claims because plaintiff is not prejudiced therefrom. Plaintiff's various requests for injunctive relief and for damages for defendant's alleged tortious contract interference are denied. Defendant's demand for permanent injunctive relief, pursuant to 15 U.S.C. § 1116, is granted.

A Special Master will be appointed, pursuant to Rule 53, Fed.R.Civ.P., to take an accounting and determine the amount of plaintiff's profits by reason of its sales using the infringing mark and to find defendant's damages due to plaintiff's acts of infringement and unfair competition since its re-entry into the American market in 1952.

The foregoing opinion constitutes this court's findings of fact and conclusions of law, in accordance with Rule 52(a), Fed.R.Civ.P., and also disposes of defendant's motion to dismiss the action as wholly insufficient to establish damages upon which we reserved at trial.[72]

The parties are directed to settle a judgment not inconsistent with this opinion within twenty (20) days.

69. Field Enterprises Educational Corp. v. Cove Indus., Inc., *supra*, 297 F.Supp. at 996.

70. Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861, 863 (S.D.N.Y.1962), aff'd, 312 F.2d 125 (2d Cir. 1963).

71. John Walker & Sons, Ltd. v. Bethea, 305 F.Supp. 1302, 1309–1310 (D.S.C.1969).

72. Tr. 124.